[Crim. No. 9154. In Bank. May 25, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. RUFUS WILSON, Defendant and Appellant.

Belli, Ashe & Gerry, Belli, Ashe, Gerry & Ellison, N. Rommel Bondec and Robert L. Lieff for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Philip C. Griffin, Deputy Attorney General, for Plaintiff and Respondent.

PETERS, J.—Defendant, Rufus Wilson, was charged by information with two counts of murder (Pen. Code, § 187) and two counts of assault with a deadly weapon with intent to commit murder (Pen. Code, § 217).

On April 13, 1965, after a jury trial, defendant was found guilty as charged in the two murder counts and one assault count, and guilty of assault with a deadly weapon, a lesser offense included within the remaining assault charge.

On April 16, 1965, the jury fixed the penalty for the commission of the murders as death. Motions for a new trial and reduction of penalty were denied. This appeal is automatic. (Pen. Code, § 1239, subd. (b).)

Defendant has no prior criminal record, is 43 years of age, and for the past 19 years has worked as a forklift operator in Los Angeles. He was married to Ann Wilson for nine years. She left him, and on January 8, 1964, filed for divorce. After their separation defendant attempted to effect a reconciliation, and occasionally they met or talked on the telephone.

A summary of the prosecution's testimony is as follows: On the evening of October 14, 1964, at about 10:30 p.m., Lewis B. Champion, Joe L. Stoglin, and William Washington accompanied defendant's wife to her apartment in Los Angeles. After they arrived at the apartment, Champion answered a telephone call from defendant. He told defendant that Mrs. Wilson was in the bathroom and unable to come to the telephone. Champion hung up when Mrs. Wilson told him to do so. At this time Stoglin was asleep on the couch and Washington was asleep on the bed, both of which were in the living room. There had been no drinking that night. While Stoglin and Washington were asleep, Champion had been listening to the radio, and Mrs. Wilson had been using the telephone.

Soon after Champion ended his telephone conversation with defendant, he and Mrs. Wilson heard a truck rapidly pull up in the driveway and stop abruptly. They thought, correctly, it was defendant's vehicle. They next heard a crash as the glass in the door at the bottom of the stairs was broken. Mrs. Wilson called the police. She then ran through the apartment to the bathroom. On the way, she threw a pistol and some bullets on the bed. Champion picked up the pistol and a bullet, and tried unsuccessfully to load the gun. Champion

had the gun in his hand when defendant came in the door of the apartment. Seeing the pistol in Champion's hand, defendant pointed his shotgun at Champion's stomach. Champion dropped the pistol and the bullet on the couch, threw up his hands, and said "Well, I don't have anything to do with this. I don't know nothing about it." Defendant replied, "Get out then."

Champion reached down and pulled Stoglin, who was still sleeping, off the couch. Stoglin awoke and, walking past defendant, followed Champion out the apartment door and down the stairway. Champion rushed out of the apartment building and ran to his home, about a mile away. Stoglin, who was behind Champion as the two were descending the stairway, was not so fortunate. Defendant shot and wounded him, though not mortally.[1]

During these events Mrs. Wilson was locked in the bathroom. When police officers later came to the apartment they found the bathroom door off its hinges and leaning inward. The door had two bullet holes in it. The interior of the bathroom was splattered with blood, and Mrs. Wilson was found, fully clothed, lying dead in the bathtub. She had a large wound in her chest and another in her right hip. The police also found the body of William Washington lying dead on the kitchen floor. He had been shot.

A ballistics expert with the Los Angeles Police Department testified that from the nature of the chest wound he formed the opinion that the muzzle of the shotgun used to kill Mrs. Wilson was about 8 to 12 inches away from her body when fired. The officer also believed that the two holes in the bathroom door were caused by placing the muzzle of the double-barreled weapon up against the door and firing.

Officer James Monaghan of the Los Angeles police testified that as he and Police Officer Robert Miller arrived near Mrs. Wilson's house in response to her telephone call defendant was proceeding away from the apartment house in his truck. Officer Monaghan testified, and this testimony is undisputed, that after stopping defendant and learning that he had something to do with what went on at the scene of the shooting, and after making their protective search, the arresting officers admonished him of his right to remain silent, his right to counsel before making any statements, and informed him that

---

[1]At the time of trial Stoglin was living in Arizona and did not testify.

any statements made might be used against him in criminal proceedings.

Officer Monaghan stated that thereafter in response to questioning by himself and Officer Miller, defendant made various statements freely and voluntarily. Defendant told the officers that he had something to do with what went on at the scene of the shooting; that the shotgun found in the truck was his; that he and his wife had been separated for about seven months; "that he had had a telephone conversation with her approximately an hour before the time he had gone over to . . . [her apartment]; . . . that a male voice told him on the phone to get lost and quit bothering her"; that he became angry at this and loaded his shotgun and went to her apartment; that after breaking in the front door he found three men with his wife and fired at them; that he had received the cut on his wrist when he broke the window in the door; and that one of the men in the apartment pleaded with him not to shoot, so he let him leave. Defendant did not deny these statements at trial, but claimed that he did not remember making them.

Defendant's testimony may be summarized as follows: On the night in question, while he was playing cards with his landlady and two other persons, he received a telephone call from his wife. She told him that she was giving a party and invited him to come. When she told him that she had also invited other men, defendant ended the conversation by replying: "Well, give the party to them. I'm not interested."

Later, after the card game ended, defendant went to the store for cigarettes. He came back, and then returned to the store for aspirin and a can of beer. As he alighted from his pickup truck after arriving back from the second trip, a car, which he thought belonged to his wife, pulled up behind him in the driveway to his home. Two men were in the car, and were unknown to defendant. They asked him if he was going to his wife's party. Defendant said "Are you talking to me?" One man answered, "Yeah, I'm talking to you, your wife is giving you a party, and you're way behind time on it." Defendant replied, "Fellow, I don't have any beef with you. Why don't you go on and let me alone." At this point one of the men threw his hat onto the driveway and said, "Well, you come on over and bring my hat with you, and we'll be waiting for you."

Defendant was "terrorized" and "aggravated" by this encounter. He called his wife soon afterward in an attempt to

learn what the two men wanted with him. Her telephone was answered by a man who told defendant that his wife was not in, and that "we got rid of her for tonight. We's waiting on you." After the man cursed at him, defendant hung up. This telephone call further "terrorized" and "aggravated" defendant, and he remained in this state for some time afterward. He decided to go to his wife's apartment in order to find out what the men wanted of him. He took a shotgun with him. He did not intend to kill anybody, but merely wanted to give the men "a scare" and "run them away." He thought the gun was necessary because there were two or three men there.

When defendant arrived at his wife's apartment, which was about 1½ miles from his establishment, he found the outside door to the building locked. He returned to his truck for tools with which to open the door and, remembering that he had the gun with him, took the gun and used the stock to break a glass window in the door. He reached through the glass and unlatched the door, cutting his hand in the process.

Defendant then ascended the stairs and forcibly entered his wife's apartment. After finding the men there and permitting Champion and Stoglin to leave, he watched the two men descend the stairs and saw Stoglin stop and "put his hand up underneath his clothes or sweater." Defendant fired at him, because he thought Stoglin was reaching for a gun.

Inside the apartment William Washington had awakened and was kneeling beside the refrigerator with his hands out of sight as defendant turned towards him. Defendant testified that Washington "got up and came right at me." Washington was shot and killed.

Although defendant recalled some surrounding objects and events, and recalled being afraid of Washington, he had no recollection of firing the shots that killed Washington and Mrs. Wilson. When asked on direct examination if he fired at Washington he stated "I think I did"; but after that, "I don't remember. . . . It seemed like noises all over the place," that he did not remember firing through the bathroom door, and that he did not know at the time whether anybody was then in the bathroom.

Defendant also testified that "I don't say I remember whether I was afraid of him [Washington] or not. . . . I couldn't tell what I was thinking, because I don't know myself." He reiterated that he did not remember firing and

that he did not know what happened during the shootings. Defendant also stated that at the time he was arrested he did not know whether he had shot Stoglin in the back. He claimed that he did not know where or when he was arrested.

The jury was instructed on the elements which they must find in order to convict of murder in the first or second degree, and the elements necessary to convict of the lesser included offense of manslaughter. The instruction on first degree murder included the instructions that "Murder which is committed in the perpetration of burglary, is murder of the first degree, whether the murder was intentional, unintentional or accidental"; that "Every person who enters any structure such as is shown by the evidence in this case, with intent to commit any felony is guilty of burglary"; and that "assault with a deadly weapon is a felony."

At trial, by his testimony in which he did not deny the shootings, defendant raised two defenses to the murder charges, both of which are sound. In the first place, his testimony was to the effect that when he entered the apartment he only intended to scare the occupants and had no intent to kill. Based on this evidence he only committed a misdemeanor, a violation of section 417 of the Penal Code (the drawing, exhibiting or using a firearm or other deadly weapon) and was not guilty of breaking and entering with intent to commit a felony. If this testimony were believed the felony-murder rule was not applicable. Defendant was entitled to an instruction on this point.

The second defense raised at trial was that defendant was unconscious at the time he committed the homicides and was therefore incapable of forming the necessary intent. Defendant's request for instructions on the defense of unconsciousness was refused.[2]

[2]The proffered instructions read as follows:

"Where a person commits an act without being conscious thereof, such act is not criminal even though, if committed by a person who was conscious, it would be a crime.

"This rule of law does not apply to a case in which the mental state of the person in question is due to insanity, mental defect or voluntary intoxication resulting from the use of drugs or intoxicating liquor, but applies only to cases of the unconsciousness of persons of sound mind as, for example, somnambulists or persons suffering from the delirium of fever, epilepsy, a blow on the head or the involuntary taking of drugs or intoxicating liquor, and other cases in which there is no functioning of the conscious mind and the person's acts are controlled solely by the subconscious mind." (CALJIC No. 71-C.)

"When the evidence shows that a person acted as if he was conscious, the law presumes that he then was conscious. The presumption, however,

Instructions in reference to section 417 were not requested nor were they given by the court on its own motion. The court's failure to instruct on these two issues effectively removed from the jury one of the principal defenses presented, constituted error in the circumstances of this case, and requires that the murder convictions be reversed. The error was clearly prejudicial.

Section 417 provides: "Every person who, except in self-defense, in the presence of any other person, draws or exhibits any firearm, whether loaded or unloaded, . . . in a rude, angry or threatening manner, or who in any manner, unlawfully uses the same in any fight or quarrel is guilty of a misdemeanor." Defendant's testimony that he entered his wife's apartment with the intent to "scare" the men there[3] brings him within the purview of this section.

Defendant's testimony that he entered with an intent to scare rather than to assault was supported by the fact that defendant permitted Champion, the first person he encountered, to leave unmolested and by defendant's further testimony that he only fired at Stoglin and Washington in what he considered to be self-defense. This issue was also explored in some detail by both the prosecution and the defense in their closing arguments to the jury. At one point in his summation, the district attorney stated: ". . . under the theory that he went there for the purpose of committing a

is disputable and may be overcome or questioned by evidence to the contrary.

"If you should find that the defendant committed an act, which, if he was conscious, would have constituted the crime charged against him or would have been an element of that crime, and, if you have a reasonable doubt whether the defendant was conscious at the time of such act, you should find he was then unconscious." (CALJIC No. 71-D.)

"You are reminded that a person might be legally sane, as we define that term in dealing with the question of criminal responsibility, and yet be in an abnormal mental or nervous condition; and because of such condition he might be less likely or unable to have or to hold a specific intent or a certain state of mind, which is an essential ingredient of a certain crime. We have received evidence bearing on the mental and nervous condition of the defendant at the time of the alleged commission of the crime charged. Such evidence may be considered by you in determining whether or not defendant did any act charged against him and, if so, whether or not, at that time, there existed in him the specific mental factor and intent which must accompany that act to constitute a certain crime or degree of crime. You do not [at this time] have before you any issue as to defendant's legal sanity." (CALJIC No. 73-B.)

[3]The following questions and answers occurred on direct examination of defendant:
"Q. What did you have the gun for?
"A. I can't explain it.
"Q. Well, I mean, did you mean to go over and kill somebody?

felony, . . . [assault with a deadly weapon] and during the course of that burglary he shot and killed two people, which the law says automatically is a first degree murder, if you believe he entered that place for the purpose of committing a felony—and he told you twice under oath that he went there to scare those people out, and he went there with a loaded shotgun. Now, if that isn't for the purpose of committing a felony, I don't know what it is. But you didn't hear Mr. Moore [defense counsel] talk about that at all, did you? Not at all.'' This argument is erroneous insofar as it states that if defendant went to the apartment only ''to scare those people out,'' he intended to commit a felony.

Proper instructions on section 417 would have told the jury that violation of the section was merely a misdemeanor and that, if defendant entered the apartment with an intent to violate that section and not to commit an assault with a deadly weapon, his entry would not constitute a burglary, and that the felony-murder rule was inapplicable. Proper instructions also would have permitted the jury to find that the killing occurred without malice in the commission of an unlawful act not amounting to a felony, a violation of section 417, which is involuntary manslaughter. (Pen. Code, § 192, subd. 2.)

---

''A. No. I just figured I would give them a scare.

''Q. Well, how were you going to give them a scare?

''A. By running them away. Let them know that I actually wasn't scared of them.

''Q. Well, couldn't you have gone over with your bare hands and done that?

''A. With two guys already had came over, and a third one on the phone? I guess—or, I presumed the third one. At least it was two. I don't think I could do it.''

Defendant reaffirmed this position on cross-examination as follows:

''Q. . . . Are you telling this jury that you went over there to scare those men out of your wife's apartment?

''. . . . . . . . . .

''THE WITNESS: Attempt to.

''. . . . . . . . . .

''Q. Well, then, why did you put the shotgun in the bed of the truck when you left—or, in the truck when you left?

''. . . . . . . . . .

''THE WITNESS: Well, I planned on giving the fellows a scare, anyway.

''. . . . . . . . . .

''Q. Why did you let him [Champion] go down the stairs at that time?

''A. I wasn't intending to do anything with him in the first place.

''Q. You intended to scare him?

''A. That's right.

''Q. Did you feel he was scared?

''A. I felt he was scared, and he was on his way, and so I felt that he was scared enough, and he was on his way, and that is all I intended to do in the first place, was scare him.''

This case is indistinguishable from *People* v. *Carmen,* 36 Cal.2d 768 [228 P.2d 281]. There defendant had a loaded gun, pointed it at his assailants, and shot and killed one of them. The prosecution there proceeded on the theory of a felony murder—that is that the killing occurred during a felonious assault. Defendant had testified that he shot to frighten his assailants, not with intent to kill anybody. The court, relying on section 417 of the Penal Code, the very section here involved, held that he was entitled to an instruction based on manslaughter on the ground that if his testimony was correct the killing occurred during the commission of a misdemeanor and not a felony. (*People* v. *Carmen, supra,* at pp. 774-775.)

The failure of defense counsel to request instructions on section 417 and its application to the facts of this case does not preclude defendant from raising this point on this appeal. ▮ It is settled that in criminal cases, even when not requested, the court must instruct on the general principles of law relevant to the issues raised by the evidence. (*People* v. *Jackson,* 59 Cal.2d 375, 380 [29 Cal.Rptr. 505, 379 P.2d 937]; *People* v. *Putnam,* 20 Cal.2d 885, 890 [129 P.2d 367]; *People* v. *Warren,* 16 Cal.2d 103, 116-117 [104 P.2d 1024].)[4] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case. (*People* v. *Wade,* 53 Cal.2d 322, 334 [1 Cal. Rptr. 683, 348 P.2d 116]; see Witkin, Cal. Criminal Procedure (1963) § 472, p. 478, and authorities cited therein.)

▮ Under the evidence here presented, instructions on section 417 were closely and openly connected with the facts before the court. The jury, as already indicated, was instructed that it could find defendant guilty of murder in

---

[4]In this connection, section 1127 of the Penal Code is relevant. Section 1127 states in part: ''the court *may* instruct the jury regarding the law applicable to the facts of the case'' (italics added); subdivision 6 of section 1093 provides ''The judge may then charge the jury, and must do so on any points pertinent to the issue, if requested by either party; . . .'' In *People* v. *Bender,* 27 Cal.2d 164 [163 P.2d 8], we stated with respect to these provisions that ''it may appear that the duty of the trial judge to give instructions, in the absence of request therefor, extends only to those instructions which the Penal Code expressly requires. But we cannot believe that, as the People argue, 'the legislative intent, by the amendment [of section 1127 in 1935], was to relieve the court from the duty of charging the jury, *on the court's own motion,* on *all* matters of law necessary for their information . . .' (Italics added.) The verdict of a jury uninstructed as to the law relating to the facts of a case cannot be sustained merely because proper instructions were not requested.'' (27 Cal.2d at p. 176.)

the first degree if it found that he entered the building with the intent to commit an assault with a deadly weapon. Although the jury could not properly conclude that defendant entered with intent to commit a felonious assault or homicide merely because such an assault or homicide occurred, the other facts developed by the prosecution would support the inference that he entered with the necessary intent. (See *People* v. *Sears*, 62 Cal.2d 737, 745-746 [44 Cal.Rptr. 330, 401 P.2d 938]; *People* v. *Clifton*, 148 Cal.App.2d 276, 277-279 [306 P.2d 545].)

Defendant in his testimony admitted that he forcibly entered the apartment, and his entry was clearly unlawful. The crucial issue was his intent when he entered, and the instruction on the felony-murder doctrine focused on that intent. Defendant's testimony as to this issue was unambiguous and constituted direct evidence that when he entered the apartment he did not have a felonious intent but intended only to scare the occupants of the apartment. The district attorney's statement to the jury, although erroneous in part, also served to emphasize the importance of the defendant's intent in entering the apartment. Furthermore, instructions on section 417 were necessary to a proper understanding of the instruction that the killing of a person without malice in the commission of an unlawful act not amounting to a felony is involuntary manslaughter. (Cf. *People* v. *Carmen, supra,* 36 Cal.2d 768, 776.) In the circumstances of the present case, it was error for the court to fail to instruct on its own motion on section 417.

The second serious error has to do with the denial of the instructions on unconsciousness. Defendant, at trial, raised the defense that he was unconscious when he committed the homicides and was therefore incapable of forming the necessary intent to constitute first degree murder. As already pointed out his requested instructions on unconsciousness were refused.

The requirement that to constitute the crimes here charged there must be a union of act and intent is embodied in section 20 of the Penal Code. That section provides that "In every crime or public offense there must exist a union, or joint operation of act and intent, or criminal negligence." The commissioners who drafted section 20 made it abundantly clear that the word "intent" in that section means wrongful intent.[5]

---

[5]The commissioners' annotation to section 20 of the California Penal

■ The same fundamental principle expressed in section 20 is also found in section 26, subdivision Five, of the Penal Code. This latter provision declares that a defendant cannot be adjudged guilty of any crime with which he is charged if he committed the act while unconscious.[6] (See *People* v. *Gorshen*, 51 Cal.2d 716, 727 [336 P.2d 492]; *People* v. *Baker*, 42 Cal.2d 550, 575 [268 P.2d 705]; *People* v. *Danielly*, 33 Cal.2d 362, 376 [202 P.2d 18], cert. den., 337 U.S. 919 [93 L.Ed. 1728, 69 S.Ct. 1162].)

As was said in *People* v. *Baker, supra,* (42 Cal.2d at p. 575), "Unconsciousness is a complete, not a partial, defense to a criminal charge (Pen. Code, § 26, subd. Five)." (See also *People* v. *Anderson,* 63 Cal.2d 351, 366 [46 Cal.Rptr. 763, 406 P.2d 43]; *People* v. *Gorshen, supra,* 51 Cal.2d 716, 727.)

■ That the proffered instructions on unconsciousness should have been given was decided in *People* v. *Bridgehouse,* 47 Cal.2d 406 [303 P.2d 1018]. In that case the defendant, who had been apprised for some time that his wife was having a love affair with another man, had been attempting to salvage his marriage. He killed his wife's lover when he came upon him in his mother-in-law's house where he had come to visit his children. The only evidence of unconsciousness was the defendant's testimony that he walked over to where the deceased was sitting and, as stated by the defendant, " 'It is very hazy, but I believe I spoke to him, and it is my recollection that at that time that I wanted to discuss . . . the legal action that I was taking against him and that I wanted to get it over with and get it out of my system and talk it out with him.' " (*Id.* at p. 410.) The defendant testified also that he seemed " 'to have a very vague memory of him springing from the couch,' " and that, " 'As near as I can possibly reconstruct in my mind, the next thing I remember was pulling the trigger on empty cartridges.' " The defendant

Code of 1872 quoted with approval the following statement from 1 Bishop's Criminal Law, section 227: " 'There is only one criterion by which the guilt of men is to be tested. It is whether the mind is criminal. . . . It is, therefore, a principle of our legal system, as probably of every other, that the essence of the offense is the wrongful intent, without which it cannot exist." (Cited in *People* v. *Vogel,* 46 Cal.2d 798, 801, fn. 2 [299 P.2d 850].)

[6]Penal Code section 26 provides in part as follows:

"All persons are capable of committing crimes except those belonging to the following classes:

". . . . . . . . . .

"Five—Persons who committed the act charged without being conscious thereof."

further stated that, " 'The whole action was of such an explosive nature, you might say, and so distorted by a haze of mental void, you might say, that a detailed remembrance of the whole action are [*sic*] very—'; . . ." (*Id.* at p. 410.) The defendant had made similar statements to the police upon his arrest.

It was stated in *Bridgehouse, supra,* (47 Cal.2d at p. 414), that it was error for the court to refuse the instructions on the legal effect of unconsciousness offered by the defendant and upon which he relied as a defense. (See also *People* v. *Roerman,* 189 Cal.App.2d 150, 161 [10 Cal.Rptr. 870]; *People* v. *Cox,* 67 Cal.App.2d 166, 171-172 [153 P.2d 362]; *People* v. *Sameniego,* 118 Cal.App. 165, 173 [4 P.2d 809, 5 P.2d 653].) In *Bridgehouse,* as here, the only evidence of unconsciousness came from the defendant.

In the instant case, defendant testified that he did not remember shooting Washington or his wife and that he was distraught and mentally exacerbated by the events which preceded and precipitated his actions. This testimony was consistent with the story first told the police when he was arrested. For the purposes of determining whether the instructions proffered by defense counsel should have been given, the trial court was bound to take this testimony as entirely true (*People* v. *Keefer,* 65 Cal. 232, 233-234 [3 P. 818]), regardless of whether it was of a character to inspire belief. (*People* v. *Miller,* 57 Cal.2d 821, 829 [22 Cal.Rptr. 465, 372 P.2d 297]; *People* v. *Carmen, supra,* 36 Cal.2d 768, 773; *People* v. *Burns,* 88 Cal.App.2d 867, 871 [200 P.2d 137].)

In *People* v. *Modesto,* 59 Cal.2d 722, 729 [31 Cal.Rptr. 225, 382 P.2d 33], this court quoted with approval the emphatic statement in *People* v. *Carmen, supra* (at p. 773), the leading case on the issue, that "*The fact that the evidence may not be of a character to inspire belief does not authorize the refusal of an instruction based thereon.* [Citations.] *That is a question within the exclusive province of the jury. However incredible the testimony of a defendant may be he is entitled to an instruction based upon the hypothesis that it is entirely true.*" (Italics in original.) If, as must be assumed for this limited purpose, defendant's testimony was true, then it was clearly error to refuse to instruct on section 26, subdivision Five, as requested.

Under these cases,[7] the defendant, particularly in a capital

---

[7]*People* v. *Talbot,* 64 Cal.2d 691, 711 [51 Cal.Rptr. 417, 414 P.2d 633], did not overrule the well-settled rules of *Modesto* and *Carmen.*

case, is entitled to have the jury instructed on the law applicable to the evidence he presents. Doubts as to the sufficiency of the evidence to warrant instructions should be resolved in favor of the accused. Such a rule assures compliance with the rules laid down in section 1093 of the Penal Code.[8] ▮▮▮ In view of the failure to give instructions on unconsciousness, the instruction on malice aforethought also must be held to have been erroneous. The jury was instructed that malice aforethought may be expressed or implied and that it "is implied when no considerable provocation appears, . . ." This instruction as to what constitutes malice was unqualified. (It may further be noted that the instructions on manslaughter, voluntary and involuntary, each stated at the outset that manslaughter is an unlawful killing "without malice.") Thus the jury under the malice aforethought instruction could, indeed should, find malice aforethought if there was no considerable provocation notwithstanding the fact that defendant was not acting consciously at the time of the killing. This was improper. (*People* v. *Conley*, 64 Cal.2d 310, 322 [49 Cal.Rptr. 815, 411 P.2d 911].)

▮▮▮ These errors require reversal. The court's failure to instruct on section 417 and on unconsciousness effectively removed from the jury's consideration the principal defenses presented. The harm to defendant by the failure to give the unconsciousness instructions was magnified by the instruction on malice aforethought which when given without qualification by an unconsciousness instruction permitted the finding of implied malice without regard to a determination as to defendant's ability to formulate the requisite specific intent.

---

[8] Penal Code section 1093 provides in part as follows:

"The jury having been impaneled and sworn, unless waived, the trial must proceed in the following order, unless otherwise directed by the court:

". . . . . . . . . .

"6. The judge may then charge the jury, and must do so on any points of law pertinent to the issue, if requested by either party; and he may state the testimony, and may comment on the failure of the defendant to explain or deny by his testimony any evidence or facts in the case against him, whether the defendant testifies or not, and he may make such comment on the evidence and the testimony and credibility of any witness as in his opinion is necessary for the proper determination of the case and he may declare the law. At the beginning of the trial or from time to time during the trial, and without any request from either party, the trial judge may give the jury such instructions on the law applicable to the case as he may deem necessary for their guidance on hearing the case. The trial judge may cause copies of instructions so given to be delivered to the jurors at the time they are given."

Instructions on section 417, as noted above, would have served to qualify the felony-murder instruction as well as to aid the jury in the proper application of the manslaughter instruction, and it does not appear that any of the other instructions eliminated the harm to defendant resulting from the failure to instruct on section 417.

■ The defendant has a constitutional right to have the jury determine every material issue presented by the evidence, and regardless of how overwhelming the evidence of guilt may be, the denial of such a fundamental right cannot be cured by section 13 of article VI of the California Constitution,■ for the denial of such a right is in itself a miscarriage of justice within that section. (*People* v. *Conley, supra,* 64 Cal.2d 310; *People* v. *Gilbert,* 63 Cal.2d 690, 704 [47 Cal.Rptr. 909, 408 P.2d 365]; *People* v. *Modesto, supra,* 59 Cal.2d 722, 730.)

■ ■ Moreover, the evidence of guilt of first degree murder in the present case is not overwhelming, and we are of the opinion that in the absence of the errors there is a reasonable probability that a result more favorable to defendant would have been reached. (*People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243].) It should be again emphasized that the evidence as to felonious entry and as to premeditation are sharply in conflict.

■ The error in failing to give the unconsciousness instructions relates only to the homicide convictions. There is no evidence to show that defendant was unconscious during the time he committed the assaults upon Champion and Stoglin which were found by the jury. This does not mean, however, that the judgment of conviction for assault with a deadly weapon upon Champion can be permitted to stand. That judgment of conviction must be reversed for failure to instruct on section 417. "An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (Pen. Code, § 240.) Defendant did not shoot or strike Champion; had the jury been instructed on section 417 the evidence would have justified the conclusion that defendant committed a violation of that section rather than the assault found. (*People* v. *Carmen, supra,* 36 Cal.2d 768, 774-775.) Under the rules set forth above, the error must be deemed prejudicial.

■ A different situation is presented with regard to defendant's conviction of assault with a deadly weapon with

intent to commit murder as to Stoglin. Defendant did not claim that he shot at Stoglin to scare him nor did defendant testify that he was unconscious at the time of that shooting. Thus, the errors noted above cannot have affected this conviction.

■ There are other claimed errors. They are without merit.

Defendant contends that the instruction on assault with a deadly weapon was erroneous in that it omitted the necessary element of specific intent. This is not so. The instruction, in its relevant part, provides:

"To constitute an assault with a deadly weapon, actual injury need not be caused. The characteristic and necessary elements of the offense are the unlawful attempt, with criminal intent, to commit a violent injury upon the person of another, the use of a deadly weapon in that attempt, and the then present ability to accomplish the injury. If an injury is inflicted, that fact may be considered by the jury, in connection with all the evidence, in determining the means used, the manner in which the injury was inflicted, and the type of offense committed."[9]

Notwithstanding defendant's argument to the contrary, the term "intent" in this instruction has specific reference to the attempt to commit a violent injury upon the person of another with the use of a deadly weapon. That is to say, the scope of the requisite intent is sufficiently circumscribed by the instruction so that the jury could not reasonably have believed that a finding of general intent would suffice to convict of assault with a deadly weapon.

■ Defendant contends that the rules announced in *Escobedo* v. *Illinois*, 378 U.S. 478 [12 L.Ed.2d 917, 84 S.Ct. 1758], and in *People* v. *Dorado*, 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], are applicable to this appeal. This contention is correct. (*People* v. *Rollins*, 65 Cal.2d 681 [56 Cal. Rptr. 293, 423 P.2d 221].) But defendant's contention that his statements given to the police were secured under circumstances that violated those rules is incorrect. The record adequately demonstrates that some of the statements were secured before defendant was arrested and before the investigation had reached the accusatory stage. (See *People* v. *Stewart*, 62 Cal.2d 571, 576-580 [43 Cal.Rptr. 201, 400 P.2d 97], affirmed *sub nom. Miranda* v. *Arizona*, 384 U.S. 436 [16

---

[9]CALJIC (rev. ed. 1958) No. 604.

L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].) As to the other statements, the record shows that defendant was properly informed of his right to counsel and of his right to remain silent, and was warned that any statement made might be used against him in criminal proceedings. Notwithstanding these admonitions, defendant made various statements to the arresting officers. Defendant did not testify that he was coerced into making the statements, and the record indicates that when he made them he intelligently waived his rights to counsel and to remain silent. The undisputed testimony is that defendant was calm and sober at the time of arrest and spoke freely and voluntarily to the arresting officers. Thus, under the evidence, the prosecution made out a prima facie case that at the time he gave the statements to the arresting officers, defendant was able to, and did, intelligently waive his rights to counsel and to remain silent. This prima facie case was in no way rebutted. Therefore, the requirements for a showing of waiver set forth in *Carnley* v. *Cochran*, 369 U.S. 506, 516 [8 L.Ed.2d 70, 77-78, 82 S.Ct. 884], were met by the prosecution. (See also *Johnson* v. *Zerbst*, 304 U.S. 458, 464 [82 L.Ed. 1461, 1466, 68 S.Ct. 1019, 146 A.L.R. 357].)

While the record does not show that there was a compliance with the new rules announced in *Miranda* v. *Arizona, supra,* 384 U.S. 436, the new rules announced in that case are not applicable to cases tried, as was this case, before *Miranda* was decided. (*Johnson* v. *New Jersey,* 384 U.S. 719 [16 L.Ed.2d 882, 86 S.Ct. 1772] ; *People* v. *Rollins, supra,* 65 Cal.2d 681.)

The contention that the district attorney was guilty of prejudicial misconduct in his cross-examination of defendant is without merit. While some of the challenged remarks may have been intemperate and well could have been omitted, they were not prejudicial or made without provocation. It should be noted that no admonition was requested by defense counsel or given by the court. Thus, it would appear that neither counsel nor the trial court deemed the remarks to be of any particular consequence. Absent gross improprieties, the determination whether an attorney has overstepped the bounds of legal propriety in his conduct of the trial is a matter which is usually left to the discretion of the trial judge. (*People* v. *Mayes,* 113 Cal. 618, 621-622 [45 P 860].)

For the reasons above stated, that the trial court failed to give instructions on section 417 of the Penal Code on its own motion and improperly refused to give the proffered instructions on unconsciousness, the judgments of conviction on the

two counts of murder, and of the assault with a deadly weapon on Champion, are reversed, and the case remanded for a new trial. The judgment of conviction of assault with a deadly weapon with intent to murder Stoglin is affirmed.

Traynor, C. J., Tobriner, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

McCOMB, J.—I dissent. I would affirm the judgment of the trial court in its entirety.