Filed 2/11/15  P. v. Sullivan CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E060157 |
| v. | (Super.Ct.No. INF1201441) |
| DANIEL PATRICK SULLIVAN, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  James S. Hawkins, Judge. Affirmed.

John L. Staley, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Michael Joseph Benke, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Daniel Patrick Sullivan appeals after he was convicted of one count of assault with a firearm in violation of Penal Code section 245, subdivision (a)(2), with a firearm personal-use enhancement, and one count of negligent discharge of a firearm in violation of Penal Code section 246.3, again with an attendant firearm-use allegation. Defendant raises issues concerning sentencing and alleged errors in the jury instructions. We affirm.

<u>FACTS AND PROCEDURAL HISTORY</u>

Benjamin Felix, the victim, owned an auto repair business, Switch Happy Auto Works. Felix had known defendant for about one to two years before the events of June 2012. Defendant worked for a local radio station, and Felix had purchased some on-air advertising for his business at the radio station. Defendant had also sometimes brought cars to the shop for repairs.

Since July 2010, defendant had stored a Chevrolet El Camino at the shop. At some point, defendant gave Felix an initial amount of $1,500 to pay for a motor for the El Camino.[1] Defendant and Felix had an informal agreement that defendant would make payments as the work on the El Camino progressed. Felix ordered the new motor, putting the money defendant had given him toward the purchase.

---

[1] In some other evidence, the sum is stated as $1,700. The exact amount is not material; the important point is that the money was spent to order the new motor, and that even that amount was insufficient to cover the entire cost of the motor, or any other costs of repairing the El Camino.

In approximately April 2012, defendant brought in his 2006 Toyota Corolla for repairs. The Corolla had been involved in an accident, and both Felix and defendant anticipated the repairs would be covered by defendant's automobile insurance carrier. Defendant's insurance carrier gave its estimate for the repairs, and preliminarily indicated that the damage would be covered by defendant's policy, but the insurance representative wanted to speak to defendant before payment would be authorized. Felix attempted to contact defendant at the telephone number he had left, to inform him of the insurer's offer, but was unable to reach defendant. Two weeks later, Felix called the insurer again, and was told that the insurer had also been unable to contact defendant. At that point, the insurer would not cover the repairs on the Corolla.

Felix saw defendant at the shop about a week later, and informed defendant that the insurer refused to cover the repairs. Defendant said he would call the insurer, and that it was a mistake. Still later, defendant came to the shop and asked Felix if he could apply the money he had paid for the El Camino motor instead to the repairs on the Corolla. Felix did not agree to this proposal, explaining that he had already used the money to purchase the motor; in fact, there was a balance still due of $300 for the El Camino motor.

Thereafter, approximately every two weeks, defendant would stop by the shop, or would call Felix, and attempt to negotiate some means of getting the work done to repair the Corolla. Defendant proposed selling the El Camino and using the funds for the Corolla. Felix could not find a buyer, however. Defendant also offered to trade radio

3

advertising for repairs, or asked to make payments on the repairs, but the parties could not reach an agreement. Defendant came to Felix on April 23, 2012, and explained that the insurer and Felix had been unable to reach him because his telephone was off. Defendant and Felix agreed that Felix would repair the Corolla for $4,500 cash; defendant would bring in a deposit in one week. Several weeks later, on May 28, 2012, defendant came into the shop, saying he was still trying to get a deposit together, but that he no longer had a job. Defendant offered to let Felix take the El Camino, fix it, and sell it to raise money, but Felix declined, as there was no value in the car. Felix told defendant he could not simply store the Corolla at the shop, and that Felix needed a deposit to do the work. Felix gave defendant until June 1 to bring in a deposit, or Felix would file a mechanic's lien on the Corolla. Defendant became angry and left.

On or about June 4, 2012, three days after the deadline he had given defendant, Felix filed a lien on the Corolla for approximately $2,800: $100 for the cost of filing the lien, and $2,700 for 60 days of storage (at $45 per day) since early April.

Defendant returned on June 6, 2012, at approximately 10:30 a.m. Defendant told Felix that he was there to pick up the Corolla. Defendant and Felix had a discussion in Felix's office at the shop; the conversation was recorded by one of Felix's security cameras. Felix told defendant that defendant would first have to pay the lien on the Corolla. Defendant objected, asking how he could owe money when Felix had said he would fix the vehicle. Felix explained that the original agreement was that the insurance payment would cover the Corolla repairs. Defendant replied, "But you said that you were

4

gonna fix it with the down payment bro." Felix said he had agreed "as a favor, but it didn't work out and you don't have a paper to prove it so, like I said I'm not going to be doing favor to you because think about I'm gonna . . . take advantage or something." (*Sic*.) Defendant protested that Felix had said he "could get my $1,700.00 dollars back, bro." Felix explained to the jury that he had spent the money on the motor for the El Camino. There was a balance owing on the El Camino motor, so it had not been successfully delivered to the shop. The motor vendor also refused to refund the money already paid, because the manufacturer had already invested in building the motor. As an alternative, Felix at one point had agreed to apply the proceeds from the sale of the El Camino to the Corolla repairs, if the El Camino was sold. "If I was to sell it or he would find a buyer, we would use that money," explained Felix. The sale of the El Camino never went through, however. Felix refused to extend the favor any further, and he testified at trial that he felt defendant was trying to take advantage of him. "[J]ust because I have a shop doesn't mean I have money to fix people's cars and accept payments." Defendant was quite upset at the lien charges.

Defendant left the room. A short time later, Felix was carrying a large box to his truck when defendant confronted him. Defendant said something to the effect that "he was going to take his car regardless." As Felix was placing the box on the tailgate, he heard what sounded like a gunshot. The bullet ricocheted off the ground a few feet away from Felix. Felix turned toward defendant, and saw defendant "putting a gun at my face, at me." Felix waved his hands up to show he was not armed, and walked back toward the

5

shop, where his son was. Defendant said he wanted his car. Felix entered the large bay door, and told his son to get the car keys and give them to defendant. Felix then heard a second shot. Felix did not see where the second shot went. He retreated to the office at the back of the shop and called police. Defendant left the scene.

Witness Steven Delara, defendant's friend, accompanied defendant to the shop on June 6, 2012, with the intention to help retrieve defendant's Corolla. Delara's uncle owned a towing business; Delara was on hand to call his uncle for a tow truck when defendant reclaimed his vehicle. Delara did not initially remember seeing anything in defendant's hands, but then recalled that defendant had a beer. Delara was not aware whether defendant took any means of payment with him to pay for the car.

Delara stated that he waited in his vehicle about five minutes after defendant had alighted; Delara then got out of his vehicle and walked with defendant toward the opening of the shop. Defendant came out a short time later, telling Delara to call Delara's uncle for a tow truck. Delara returned to his vehicle while waiting for a reply text message from his uncle. Delara then tried calling his uncle. When looking back toward the shop, Delara saw defendant's hand and he heard a loud bang. Delara turned away, because he did not want to be involved in whatever was happening. He heard a second bang; the bangs sounded like gunshots. Defendant came toward Delara; they both entered Delara's vehicle and Delara drove away. Delara asked defendant what was happening with the Corolla. Defendant "was just really upset" that Felix had tried to charge him over $2,000 for storage fees. When they arrived at defendant's apartment,

6

Delara asked defendant about the bangs. Defendant pulled a small gun out of his pocket. Delara asked if defendant had fired the gun; defendant said, " 'Yeah.' " Delara took the gun from defendant, and eventually turned it over to police during the investigation.

As Delara was testifying about the events of June 6, 2012, he said that he had waited in his vehicle about five minutes after defendant had gotten out. The security video footage, however, showed Delara with defendant approaching the shop. Delara then volunteered that he might have been remembering "a couple days prior to when we were chased down with crowbars." Delara proceeded to relate that he and defendant had gone to the shop on or about May 28, 2012. On that occasion, Delara stayed in his vehicle. He saw defendant apparently arguing with Felix. Then, two to four people came out of the shop with crowbars or metal pieces in their hands, telling defendant to "get out of here." Defendant retreated, returning to Delara's car, and Delara drove away. Delara had never mentioned this incident before trial, either when he was interviewed by police or at the preliminary hearing. On June 6, 2012, Delara never saw Felix attack defendant, and defendant did not say anything to Delara about being attacked by Felix. Defendant was "just upset about the [storage] charges."

As a result of these events, defendant was charged by a felony complaint with one count of attempted murder, and one count of assault with a firearm. After a preliminary hearing, defendant was not held to answer on the attempted murder charge, and that count was dismissed. Defendant was held to answer on the charge of assault. The People filed an information charging defendant with one count of assault with a firearm (with an

7

enhancement for personal use of a firearm), and one count of grossly negligent discharge of a firearm (again with a personal use enhancement).

A jury found defendant guilty on both charges and found the enhancement allegations true. The court sentenced defendant to the low term of two years for the assault, the low term of three years for the personal use enhancement, and a consecutive middle term of eight months for the negligent discharge offense. Defendant's total prison sentence was five years eight months.

Defendant filed a timely notice of appeal.

ANALYSIS

Defendant contends that the trial court erred in failing to find defendant eligible for probation, in failing to give a unanimity instruction, and in failing to give instructions on the offense of brandishing a firearm as a lesser included offense on count 1, the assault charge. We find no reversible error.

I. The Trial Court Did Not Abuse Its Discretion in Declining to Find an "Unusual Case,"

Which Would Have Permitted Defendant to Be Admitted to Probation

Penal Code section 1203, subdivision (e), provides in relevant part: "(e) Except in unusual cases where the interests of justice would best be served if the person is granted probation, probation shall not be granted to any of the following persons: [¶] . . .[¶] (2) Any person who used, or attempted to use, a deadly weapon upon a human being in connection with the perpetration of the crime of which he or she has been convicted. . . ."

8

Defendant used a firearm in the commission of his crimes.  He was statutorily ineligible for probation, unless the trial court found this was an "unusual case" where the "interests of justice would be best served" by granting probation to defendant.  (*People v. Stuart* (2007) 156 Cal.App.4th 165, 177.)  The trial court has a broad discretion whether or not to grant probation.  That discretion is somewhat circumscribed by Penal Code section 1203, which directs that probation is generally not to be granted to defendants who use deadly weapons in the commission of crimes.  The trial court's finding that a case is "unusual," for purposes of granting probation, is reviewed for abuse of discretion.  (*People v. Stuart, supra,* at p. 178; *People v. Superior Court (Du)* (1992) 5 Cal.App.4th 822, 831.)  It is defendant's burden to demonstrate that the trial court's finding was arbitrary, and that no rational person could agree with the finding.  (*People v. Stuart*, *supra*, at p. 179.)

Rule 4.413 of the California Rules of Court sets forth the guidelines for determining whether a case is "unusual" for purposes of eligibility for probation, despite Penal Code section 1203.[2]  Defendant asserts that all of the "unusual case" facts apply to

---

[2]  See rule 4.413(c):  "(c)  **Facts showing unusual case**  [¶]  The following facts may indicate the existence of an unusual case in which probation may be granted if otherwise appropriate:  [¶]  (1)  *Facts relating to basis for limitation on probation* A fact or circumstance indicating that the basis for the statutory limitation on probation, although technically present, is not fully applicable to the case, including:  [¶]  (A)  The fact or circumstance giving rise to the limitation on probation is, in this case, substantially less serious than the circumstances typically present in other cases involving the same probation limitation, and the defendant has no recent record of committing similar crimes or crimes of violence; and  [¶]  (B)  The current offense is less serious than a prior felony conviction that is the cause of the limitation on probation, and the defendant has been free from incarceration and serious violation of the law for a

*[footnote continued on next page]*

9

him: He contends that the use of the firearm was less serious than the typical use of a firearm in the commission of a crime. He claims he resorted to trying to intimidate Felix with the gun "because Felix was essentially extorting money from him, manipulating the situation to his financial advantage, and had subjected [defendant] to physical threats with a tire iron or crow bar the previous week." Defendant claims that he never pointed the gun at Felix, as the video purportedly shows his arm pointed toward the ground.[3] Defendant had no recent record of committing other similar crimes or crimes of violence. Defendant was 27 years old and had no prior criminal record, so he was youthful and had no significant prior offenses. Defendant claims that he committed the offenses "because Felix provoked him."

Defendant's argument hinges upon interpreting the evidence in the light most favorable to himself, rather than in the light most favorable to the trial court's ruling.

---

*[footnote continued from previous page]*
substantial time before the current offense. [¶] (2) *Facts limiting defendant's culpability* A fact or circumstance not amounting to a defense, but reducing the defendant's culpability for the offense, including: [¶] (A) The defendant participated in the crime under circumstances of great provocation, coercion, or duress not amounting to a defense, and the defendant has no recent record of committing crimes of violence; [¶] (B) The crime was committed because of a mental condition not amounting to a defense, and there is a high likelihood that the defendant would respond favorably to mental health care and treatment that would be required as a condition of probation; and [¶] (C) The defendant is youthful or aged, and has no significant record of prior criminal offenses."

[3] Review of the surveillance video shows, at one point, defendant extending his arm with the gun forward toward Felix while Felix was placing the box into the truck bed. Inferentially, that was when defendant fired the first shot. Thereafter, when Felix had turned around in response to the shot, defendant moved about and waved the gun erratically.

10

Defendant's claims of provocation, extortion, and financial manipulation are belied by the evidence.

Defendant brought the vehicles to Felix for repairs, but, except for a sum of money to purchase a motor for the El Camino, he never paid any money to begin work despite numerous promises to do so. The cash defendant brought to purchase the El Camino motor was insufficient to cover the entire purchase; Felix testified that the vendor refused to refund the money. When defendant brought the Corolla in for repairs, he and Felix agreed to have the work covered by the insurance payment, but neither the insurer nor Felix was able to contact defendant for an extended period of time, leading the insurer to deny the claim. As noted, Felix was unable to obtain a refund of the purchase price of the motor to apply to the Corolla repairs, and neither he nor defendant was able to sell the El Camino. Defendant never even paid the $300 balance still owed on the El Camino motor, so Felix had never actually received delivery of the motor. Felix was therefore unable to fix the El Camino to make it more saleable. Felix had stored the El Camino on his lot for about two years with no progress on the work to be done. The Corolla had been at the shop for two months, again with no payment and no progress. The insurance payment was forfeited because neither the insurer nor Felix was able to contact defendant. Felix warned defendant that he would take out a lien on the vehicles if defendant did not bring money to pay for the work, and even waited a few days past the deadline date before filing liens on both vehicles. Felix told defendant that he had agreed to apply any money from the sale of the El Camino to the Corolla repairs, "as a favor, but

11

it didn't work out and you don't have a paper to prove it so, like I said I'm not going to []

be doing favor to you because think about I'm gonna . . . take advantage or something."

(*Sic*.) Defendant interprets this as a remark that Felix intended to take unfair advantage

of defendant, but Felix was clearly intending to forestall having defendant make any

claim that Felix was taking advantage of defendant. The only evidence adduced at trial

that Felix had threatened defendant with crowbars was the testimony of Delara,

defendant's friend. Delara volunteered that testimony at trial, and had never mentioned it

either to the police or at the preliminary hearing. The trial court was not required to

credit Delara's testimony.[4] The evidence of provocation, coercion or threats was less

than compelling, and may not have been credited by the court.

Considered in the light most favorable to the ruling, the evidence showed that

defendant purposely armed himself to go pick up his car. He had been warned

beforehand that Felix would take out a lien on the vehicles. Defendant became upset that

he would have to pay the lien charges to obtain release of the Corolla, and then resorted

to force, pulling out the gun, demanding to take the car without paying for it, and

underlining his demand with two gunshots. The crimes were not markedly less serious

than other instances in which an offender uses a gun to gain an advantage, such as to

---

[4] When defendant was arrested and interviewed by police, he also claimed that Felix and others had threatened him with tire irons the week before the shooting.

12

facilitate a theft.  That is in essence what defendant did here:  he used his gun to attempt to take the Corolla by force, without paying for the lien.[5]

Defendant was aged 26 or 27 at the time of these offenses.  He was not elderly, but he was not particularly youthful, either.[6]  In his mid-twenties, he should have been mature enough to know better than to use a gun to take property.  He also had no prior record of serious crimes, but these factors were insufficient to overcome the presumption of ineligibility for probation.  "[M]ere suitability for probation does not overcome the presumptive bar set out in sections 1203 and 1203.045.  [Former] [r]ule 413 itself evidently contemplates a two-step process when it states that '[if] the statutory limitation on probation is overcome . . . the court should *then* apply the criteria in [former] rule 414 to decide whether to grant probation.'  (Italics added.)  . . .  [I]f the statutory limitations on probation are to have any substantial scope and effect, 'unusual cases' and 'interests of justice' must be narrowly construed and, as [former] rule 413 provides, limited to

---

[5]  In defendant's police interview, he minimized his own conduct and blamed Felix, arguing that Felix had broken promises to repair the Corolla, and used the lien essentially to steal the car.  As noted, defendant also claimed Felix had threatened him the week before, as a justification for arming himself.  Defendant lied to the police, claiming that the gun was only a blank pistol, and lied again when he told police that he had thrown the gun away.  Eventually, in an unrecorded part of the interview, defendant admitted he had given the gun to Delara, who brought it to the police station a day or so later.  The recorded portion of defendant's statement was excluded at trial because the police gave incomplete *Miranda* warnings before speaking to defendant (*Miranda* v. *Arizona* (1966) 384 U.S. 436).  The unrecorded statement, in which defendant told police he had given the gun to Delara, was ruled inadmissible.

[6]  The trial court did take account of defendant's relative youthfulness in sentencing him to the low term for the principal offense, and the low term on the firearm-use enhancement.

13

those matters in which the crime is either atypical or the offender's moral blameworthiness is reduced.  A previous course of good conduct and good standing in the community is not 'reasonably related' (see [former] rule 408(a)) to the decision of whether an offense constitutes an 'unusual case where the interests of justice would be best served' by granting probation."  (*People v. Superior Court (Dorsey)* (1996) 50 Cal.App.4th 1216, 1229.)  These crimes were not "atypical," and defendant's blameworthiness was not reduced by supposed "provocation."  The trial court did not abuse its discretion in declining to find this an "unusual case" for purposes of admitting defendant to probation.

 II.  <u>The Court Was Not Required to Give a Unanimity Instruction on the Assault Charge</u>

Defendant argues that the trial court was required, but failed, to give the jury a unanimity instruction with respect to the assault charge.  Defendant urges that either of two events could support the charge—pointing the firearm at Felix, or firing the gun—and that the jury should have been instructed to agree unanimously on which act constituted the assault.

We review the legal adequacy of jury instructions under a de novo standard. (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

"The key to deciding whether to give the unanimity instruction lies in considering its purpose. . . .  But unanimity as to exactly how the crime was committed is not required.  Thus the unanimity instruction is appropriate 'when conviction on a single count could be based on two or more discrete criminal events,' but not 'where multiple

14

theories or acts may form the basis of a guilty verdict on one discrete criminal event.' "

(*People v. Russo* (2001) 25 Cal.4th 1124, 1134-1135.)

Here, there was only one "discrete criminal event." No unanimity instruction was required. "Where the evidence suggests that the defendant might have committed more than one crime, the court must instruct the jury that it must agree on which of the acts—and, hence, which of the crimes—the defendant committed. [Citations.] . . . [¶] Where, however, the evidence suggests that a defendant committed only one discrete criminal action—but may have done so in one of several different ways—no unanimity instruction is required. [Citations.] Unanimity is not required in this situation even if the jurors might conclude that the defendant is guilty based on different facts, or on different findings about the acts the defendant committed or his mental state. [Citations.] That is because, in this situation, the jury's guilty verdict will still reflect unanimous agreement that the defendant committed a single crime." (*People v. Quiroz* (2013) 215 Cal.App.4th 65, 73-74, italics omitted.)

The same reasoning applies here. Defendant pointed the gun at Felix and fired a shot at him, while demanding the return of his car. Defendant had only one object, and all the acts were done in rapid succession in pursuit of that aim. Pointing the gun and firing the shots were not discrete criminal events, but comprised a single transaction. The jury unanimously found defendant guilty of a single count of assault with a firearm. No additional unanimity instruction was required in these circumstances.

III.  The Trial Court Was Not Required to Give an Instruction on Brandishing a Firearm

Defendant contends the trial court erred in failing to instruct on the offense of brandishing a firearm as a lesser included offense of the assault.  The People respond that brandishing is not a lesser included offense of assault with a firearm.

Again, we review the legal propriety of jury instructions under a de novo standard.

Penal Code section 417, subdivision (a)(2), provides:  "(2) Every person who, except in self-defense, in the presence of any other person, draws or exhibits any firearm, whether loaded or unloaded, in a rude, angry, or threatening manner, or who in any manner, unlawfully uses a firearm in any fight or quarrel is punishable as follows:  [¶] (A) If the violation occurs in a public place and the firearm is a pistol, revolver, or other firearm capable of being concealed upon the person, by imprisonment in a county jail for not less than three months and not more than one year, by a fine not to exceed one thousand dollars ($1,000), or by both that fine and imprisonment. . . ."

Defendant points to a single case, *People v. Wilson* (1967) 66 Cal.2d 749, 759 (*Wilson*), in which the California Supreme Court reversed a conviction for assault for failing to instruct on brandishing a firearm.  Defendant acknowledges that numerous Court of Appeal cases, both before and after *Wilson* was decided, have specifically held that brandishing a firearm is not a lesser included offense of assault with a deadly weapon.[7]  But he argues that this court should reject the Court of Appeal precedents, and

_____

[7]  See, e.g., *People v. Steele* (2000) 83 Cal.App.4th 212, 219-221, review denied December 13, 2000 (*Steele*); *People v. Lipscomb* (1993) 17 Cal.App.4th 564, 569; *People v. Beach* (1983) 147 Cal.App.3d 612, 626; *People v. Orr* (1974) 43 Cal.App.3d 666, 673;

*[footnote continued on next page]*

16

instead follow *Wilson* under the principle of *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [inferior courts are bound to follow the precedents of the Supreme Court].

The People suggest, however, that the California Supreme Court in *Wilson*, *supra*, 66 Cal.2d 749 did not actually hold that brandishing a firearm was a lesser included offense of assault with a deadly weapon.  As the Court of Appeal explained in *People v. Steele, supra*, 83 Cal.App.4th 212, the Supreme Court's ruling in *Wilson* "implied—but did not directly hold—that brandishing was a lesser included offense to assault with a firearm.  That holding has no prior case support, and only scant subsequent support." (*Steele*, at p. 219.)  *Wilson* was decided before *People* v. *Geiger* (1984) 35 Cal.3d 510 (*Geiger*); both cases were part of a trend of requiring instruction on lesser related offenses, as well as lesser included offenses.  However, in *People v. Birks* (1998) 19 Cal.4th 108 (*Birks*), the California Supreme Court overruled *Geiger*, and held that a trial court is not required to instruct on lesser related offenses, but only on lesser included offenses.  (*Birks* at p. 136, fn. 19.)  An offense is lesser included to a greater offense only if the greater offense cannot be committed without also committing the lesser offense. (*Id*. at p. 117.)  Many of the cases considering the issue have pointed out that it is possible to commit an assault with a firearm without necessarily displaying a firearm in a

---

*[footnote continued from previous page]*
*People v. Escarcega* (1974) 43 Cal.App.3d 391, 396-397; *People v. Birch* (1969) 3 Cal.App.3d 167, 176; *People v. Leech* (1965) 232 Cal.App.2d 397, 399; *People v. Torres* (1957) 151 Cal.App.2d 542, 544-545; *People v. Diamond* (1939) 33 Cal.App.2d 518, 522-523; *People v. Piercy* (1911) 16 Cal.App. 13, 16.

threatening manner, as required by Penal Code section 417. "The reason of course, is that it is theoretically possible to assault someone with a firearm without exhibiting the firearm in a rude, angry or threatening manner, e.g., firing or pointing it from concealment, or behind the victim's back. [Citation.]" (*Steele*, *supra*, 83 Cal.App.4th 212, 218.)

Under the usual test for determining lesser included offenses, the "conclusion is inescapable that an assault with a firearm may be committed without the defendant brandishing such weapon. Ergo, under the Supreme Court's own rule of analysis, as recently affirmed in *Birks*, brandishing cannot be a lesser included offense to assault with a firearm." (*Steele*, *supra*, 83 Cal.App.4th 212, 221.) For this reason, defendant was not entitled to an instruction on brandishing a firearm (Pen. Code, § 417).

## DISPOSITION

Defendant's contentions on appeal are without merit. The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER

J.

We concur:

RAMIREZ

P. J.

CODRINGTON

J.

18