Filed 9/14/21  P. v. Garcia CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br>ANICASIO GARCIA,<br><br>        Defendant and Appellant. | A157727<br><br>(Alameda County<br>Super. Ct. No. 617033) |

Defendant Anicasio Garcia killed 18-year-old Nelson Diaz Velasquez (Diaz), the boyfriend of S.E., Garcia's close friend, by stabbing him once in the heart.  A jury convicted Garcia of second degree murder, and he was sentenced to 15 years to life in prison.  On appeal, Garcia claims the trial court erred by refusing to instruct on involuntary manslaughter and self-defense and by not allowing him to reargue in closing after the court altered a jury instruction on murder it intended to give.  Garcia also claims that the prosecutor erred in closing argument and that cumulative error requires reversal.  We reject these claims and affirm.

1

# I.
## FACTUAL AND PROCEDURAL
## BACKGROUND

### A.    *Background*

Garcia and S.E. were from the same town in Guatemala, and their families were friends.  In the spring of 2015, S.E. and her infant daughter moved to Oakland.  S.E. re-connected with Garcia, who already lived there.  S.E., who was about 18 years old at the time, and Garcia, who was nine years older, began regularly spending time together.  S.E. testified that she "always knew [Garcia] as a good person who was never violent," and S.E.'s mother also offered the opinion that Garcia was not violent.

Later that year, S.E. met Diaz, who was the same age, at the church she and Garcia attended.  S.E. and Diaz quickly began dating.  S.E. testified that their relationship was "[s]ometimes good and also toxic at the same time," and they broke up and got back together several times.  S.E. testified that at one point or another during the relationship, Diaz had yelled at and insulted her, cheated on her, and hit her.

S.E. testified that she continued to see Garcia "constantly" after starting to date Diaz.  Both she and Garcia, who testified in his own defense, denied they were ever in a romantic relationship.  Garcia admitted that he had feelings for S.E. "[a]t some point," but he was not in love with her.  He testified that they considered having a sexual relationship but decided not to because "it would put an end to [their] friendship."

In late 2015 or early 2016, S.E., her daughter, and her mother moved with Diaz to Tennessee, where he had family.  S.E.'s mother testified about domestic abuse perpetrated by Diaz while they lived there.  At one point, he "locked [S.E.] up [in a room] and . . . was hitting her and wouldn't let [S.E.'s mother] in."  Another time, neighbors showed S.E.'s mother photographs of

2

S.E. with bruising around her mouth, causing S.E.'s mother to believe Diaz had hit S.E. Garcia testified that S.E. later told him that Diaz had hit her in Tennessee.

S.E.'s mother also suspected Diaz had burned her granddaughter's feet with a cigarette. S.E.'s mother wanted to call the police, but Diaz threatened to kill her and her family, and S.E. said not to report the incident because she was afraid of him as well. S.E.'s mother testified that she later told Garcia that Diaz had hit S.E. and burned S.E.'s daughter, and Garcia testified that both S.E. and her mother told him about S.E.'s daughter being hurt while they were still in Tennessee.

Concerned about her granddaughter's safety, S.E.'s mother took the baby back to Oakland. In March 2016, S.E. broke up with Diaz and also moved back to Oakland, and she and Garcia began spending time together again.

B.    *The Days Leading Up to the Murder*

About two weeks before the murder, which occurred on May 27, 2016, Diaz returned to Oakland as well. Diaz had told S.E.'s mother that he was coming back to Oakland "to see who it was that [S.E.] was with and he was going to kill that person," which caused S.E.'s mother to fear for Garcia's safety. She could not remember, however, whether she ever expressed that fear to Garcia.

The first time S.E. saw Diaz after he returned from Tennessee was at a store where she had a job interview. After she finished the interview, she returned to the building lobby and saw Diaz, who "tried to take [her] with him by force." Garcia, who had driven her there, helped her leave as Diaz "was pulling on [her] and trying to take [her] to [Diaz's] car." Even after she "managed to get into [Garcia's] car, . . . [Diaz] was beating on the car trying

to get [her] to come out." Garcia testified that S.E. was "scared" and crying, and he drove her away as quickly as he could. At the time, Garcia was approximately five feet, two inches tall and weighed about 125 pounds, and Diaz was five feet, five inches tall and weighed about 165 pounds.

Soon after this incident, Diaz proposed to S.E, and she accepted. Garcia testified that the next time he saw her, she took off the ring to try to hide it from him, and he perceived that "she wasn't sure what she was doing." Indeed, less than a week after becoming engaged, S.E. decided to break up with Diaz because he "was disloyal." Specifically, he had sent her photographs of himself with another woman.

Upset, S.E. told Garcia about the photographs and asked him to drive her to Diaz's home so she could return the ring. S.E. testified that Diaz became angry after she returned the ring and told him she "no longer wanted anything to do with him." S.E. left Diaz's home and returned to Garcia's car, a yellow Mustang, which was parked a few blocks away on a dead-end street.

As S.E. and Garcia prepared to leave, she noticed that Diaz had followed her in his car. Diaz parked behind them, which blocked the Mustang from leaving. Diaz, whom S.E. described as "look[ing] very aggressive," got out of his car and began hitting Garcia's car and yelling sexually vulgar things at S.E. According to Garcia, Diaz asked him whether he had "fuck[ed] [S.E.] yet," at which point Garcia told Diaz to go away because he "[did not] want trouble with [Diaz]." Garcia testified that he was "afraid," but he "tried . . . to stay calm because [he] didn't want to get into the state that [Diaz] was in" and did not want to fight Diaz. Eventually, a neighbor asked Diaz to move his car because he was blocking the driveway, and he left.

4

The weekend before the murder, S.E. and Garcia went to the flea market together. They saw Diaz, who beckoned to S.E. and "seemed angry." Wanting to avoid Diaz, Garcia and S.E. left and went to get French fries. As they were waiting to be served, Diaz pulled up in his car and "was starting to yell at [S.E.] again. He said she was a whore and he told her to fuck off." Diaz appeared "furious" and "really angry," and Garcia's "heart was beating fast." The cars behind Diaz started honking, and he drove away before anything else happened.

C.    *The Murder*

On the morning of May 27, S.E., who did not have her own cell phone, wrote a Facebook message to Diaz. He responded that he wanted to see her that evening, and they arranged to go on a date. Meanwhile, she and Garcia also exchanged messages that day, in which she told him to "start getting used to" "not seeing [her] or talking to [her]."

At the time, S.E. was living with her sister and her sister's family at 107th and MacArthur in Oakland. Around 7:00 p.m., Diaz picked up S.E. there in his green Honda sedan, and they went to get something to drink. S.E. testified that Garcia's car was not there when Diaz picked her up.

A bystander witness, Shawn B., was hanging out that night near a department store across the street from S.E.'s apartment. He noticed a yellow Mustang parked near a dumpster in the store's parking lot. Shawn B. testified that over a period of hours, he observed a "short Hispanic guy" in the Mustang's driver's seat "slamming beers. . . . Drinking beers and drinking and drinking and drinking and drinking and drinking."

Diaz and S.E. returned around 9:00 p.m., and he parked in the department store's driveway. Noticing Garcia's car in the store's parking lot,

5

Diaz told S.E., " '[T]here's your little friend.' " She and Diaz remained in his car for about 15 minutes, talking.

Before S.E. went back to her apartment, Diaz gave her one of his cell phones so she could confirm she had gotten inside safely, and he told her not to talk to Garcia. Phone records showed that around 9:20 p.m., she called Diaz's other cell phone, and she kept him on the line as she walked to her home.

Shawn B. saw the green Honda arrive and S.E. eventually exit and walk away. He testified that as she was walking, "the yellow Mustang came out [of] the parking lot and tried to block her off," and it collided with another vehicle parked on the street. Shawn B. saw the yellow Mustang stop, and Garcia got out and approached the green Honda. The Honda moved forward, but the Mustang was blocking it from proceeding.

At trial, Shawn B. testified that he saw Garcia reach the Honda and, without provocation, "start[] punching [Diaz] through the [driver's-side] window." Shawn B. testified that he observed Garcia throw two to three punches, and he heard the other two men arguing angrily. The dumpster was partially blocking Shawn B.'s view, and he did not see anything else until Diaz, "holding his chest," approached Shawn B. and stated he had been stabbed. In contrast, in his preliminary-hearing testimony, which was read into the record, Shawn B. said he "could hear punches" but did not actually see any physical contact between Garcia and Diaz. And although shortly after the murder Shawn B. told police he saw a knife, he testified at both the preliminary hearing and trial that he never saw Garcia with a knife.

Meanwhile, S.E. had returned to the street after Diaz, who was still on the line with her, told her that he "[had] a problem." In her statements to police, S.E. said that she observed Garcia had moved his car to block in Diaz.

6

Diaz was still in his car with the window open, and Garcia tried to "grab" the other man. Garcia was trying to open the door as Diaz tried to close it, and Diaz had his hand positioned as if "he wanted to hit" Garcia. The door opened, and Diaz "gave [Garcia] a kick."

S.E. told police that she then saw Diaz get out of the car, and he and Garcia began fighting. A memorial involving an unrelated death was located by the dumpster in the department store's parking lot and included several liquor bottles. According to S.E., Diaz picked up some bottles and threw one at Garcia as she tried to hold him back. Garcia ran back to his car, and Diaz threw another bottle at him. S.E. told police that Diaz was clutching his chest after he got out of the car. She believed that he had already been stabbed, although she did not notice him bleeding. She also told police she saw Garcia holding a "screw" when he was running back to his car.

At trial, S.E. described a different version of events. She testified that Diaz was already outside his car when she returned to the street, and he "was hitting [Garcia]" and did not seem to be hurt yet. She described Diaz as "angry." She also testified that she never saw Garcia with a weapon. And while she told police that Garcia was the aggressor, because he approached Diaz first, at trial she said she was not sure who started the fight because when she returned, the men were already "hitting each other."

D.     *The Aftermath and Physical Evidence*

S.E. and Shawn B. both called 911. Police were dispatched at 9:23 p.m. and arrived at the scene eight minutes later, after Garcia had already left. Although S.E. initially told police at the scene that she did not know who had hurt Diaz or what vehicle the perpetrator was driving, she soon told them about Garcia and the yellow Mustang.

7

Diaz was taken to the hospital, where he died. The cause of death was one stab wound to the heart. The forensic pathologist who performed the autopsy testified that it was not possible to determine from the wound Diaz's position when he was stabbed, and he could have been either sitting down or standing. The pathologist also testified that after being stabbed in the heart, a person could continue for a short period of time to walk around, talk, and even "engage in a fight."

Later that night, Garcia was arrested at his home. He had significant injuries to his face, and he was transported to the hospital. Several bones around his cheek and eye were fractured, injuries that were likely caused by "a harder object than a fist." He also had a laceration on his cheek that required stitches, and surgery for his face was scheduled for a later date. His neurological assessment was normal, however.

At the scene, there was "a path of blood" between the driver's side of Diaz's car and the memorial from the unrelated death. There was also blood around the memorial and between the memorial and the middle of the street. When the scene was processed, the engine of Diaz's car was still running, the headlights were on, and the driver's-side window was down. A palm print matching Garcia's was found on the driver's door. Diaz's cell phone, which had blood on it, was on the car's passenger seat.[1]

The weapon used to stab Diaz was never located, but Garcia's cell phone contained a photograph of a knife, and GPS data showed that the photograph was taken in the department store's parking lot around 7:40 p.m.

---

[1] The prosecutor argued in closing that the blood on the cell phone indicated Diaz was stabbed while he was still in his car. On the other hand, S.E. testified that she thought Diaz had the phone in his pocket when she was trying to get him to stop fighting Garcia, and that it was possible Diaz had gotten back into his car after the fight ended.

on the night in question. A broken bottle with Diaz's blood on it was located in the yard of Garcia's house.

### E. Garcia's Statements and the Defense Case

#### 1. Garcia's interrogation

After Garcia was treated for his injuries, he was transported to the police station and interrogated. A blood draw showed he had no alcohol in his system at this point.

Garcia told police that he was "very drunk" during his encounter with Diaz and could not "remember much." Garcia stated he had been drinking because he was "disappointed" and "mad" that S.E. was still with Diaz "after everything [Diaz had done]." Garcia told police that after the French fries incident, he had told S.E. that he was going to fight Diaz the next time he saw him because he could not allow the other man to treat her poorly any more.

Garcia said he was waiting for S.E. and when she unexpectedly arrived with Diaz, it "made [him] angry." Garcia recalled, "I got in [Diaz's] face . . . [and] I think I had a knife, one of those knives to peel fruit[,] in the car and I tried to hurt [Diaz]. I tried to hurt him. And . . . when I hurt him—I think I didn't really hurt him very much because I didn't intend to go kill . . . , but when I got him, well he . . . came with some bottles . . . and hit me." According to Garcia, Diaz hit him with a bottle twice, once when Garcia was retreating to the Mustang and once after Garcia got back into his car.

In response to the police's questions, Garcia repeatedly confirmed that he "stabbed [Diaz] first" before Diaz attacked him. Garcia specifically denied that he was "scared" of Diaz when he stabbed the other man, saying he was just "mad and drunk." Garcia said that he "only wanted to scare [Diaz]" so

9

that Diaz "wouldn't bother [him] again," but he did not intend to kill him. Garcia said that had he been sober, he would not have attacked Diaz.

### 2. Garcia's testimony and other defense evidence

At trial, Garcia testified that he did not remember much of what happened on May 27. He had spoken to S.E. earlier in the day about seeing each other, and he testified that he drove to her home so they could go out to eat. The next thing he remembered was seeing S.E. walking to her apartment, and he pulled out behind her in his car because he wanted to talk to her. He got out of his car to look for her, and the next thing he remembered was seeing Diaz. Diaz was "yelling at [him]" and "coming at [him], angry in the street."

Garcia testified that Diaz hit him, but that he could not remember anything clearly after that because he "was receiving blows, [and] there's one blow that erased everything for [him]." Garcia admitted that he also hit Diaz, but he testified that Diaz hit him first. He could not remember stabbing Diaz or having a knife, and he reiterated that he "never" intended to kill Diaz. According to Garcia, he had brief memories of being at his house and treated by a nurse, but he could not remember his interrogation.

Garcia could not explain how a bottle with Diaz's blood on it got in his yard or why his palm print was found on Diaz's car. Garcia also testified that he could not remember taking the photograph of the knife, which he claimed belonged to his cousin, and he indicated he routinely photographed all sorts of random items.

A defense expert in neuropsychology who evaluated Garcia testified that Garcia's "visual problem solving" was "impaired to such [a] . . . degree" that it suggested damage to the temporal occipital lobe of his brain. The expert testified that such damage could be caused by "a contrecoup injury,"

10

during which the brain is hit and then "bounces back and hits . . . the opposite side of the skull," and Garcia could have sustained such an injury during the fight with Diaz. She also opined that Garcia had post-traumatic stress disorder from his childhood and "low average intellectual functioning," the latter of which would impair one's ability to plan.

### F. Procedural History

Garcia was charged with one count of murder, and it was alleged that he personally used a deadly and dangerous weapon during the crime.[2] At trial, it was uncontested that Garcia stabbed Diaz, and the primary disputed issue was Garcia's state of mind.

The jury was instructed on first degree murder under the theories that it was committed while lying in wait or was willful, deliberate, and premeditated, on second degree murder, on provocation as reducing first degree murder to second degree murder or murder to manslaughter, and on voluntary manslaughter based on a sudden quarrel or heat of passion. The jury was also instructed on voluntary intoxication and mental defect or disorder as affecting whether Garcia acted with the requisite mental state to be guilty of murder. The trial court declined the defense's requests for instructions on involuntary manslaughter and perfect and imperfect self-defense.

The jury acquitted Garcia of first degree murder and found him guilty of second degree murder, and it found the weapon enhancement true. The trial court struck the weapon enhancement in the interest of justice under section 1385 and sentenced Garcia to 15 years to life in prison.

---

[2] The murder charge was brought under Penal Code section 187, subdivision (a), and the weapon enhancement was alleged under Penal Code section 12022, subdivision (b)(1). All further statutory references are to the Penal Code.

11

II.

DISCUSSION

A.     *No Error Appears in the Trial Court's Refusal to Instruct on Involuntary Manslaughter.*

Garcia claims the trial court erred by denying his request for a jury instruction on involuntary manslaughter, a lesser included offense of murder. We are not persuaded.

The defense asked that the jury be instructed on involuntary manslaughter under CALCRIM No. 580. Garcia's trial counsel offered three theories for that crime: that Garcia committed assault with a deadly weapon or brandished a deadly weapon without due caution and circumspection, that he acted in self-defense without an intent to kill, and that he committed an inherently dangerous felony without malice. The trial court denied the request, finding insufficient evidence that Garcia acted without at least conscious disregard for human life, given that he stabbed Diaz in the heart with a knife.

" ' "[A] defendant has a constitutional right to have the jury determine every material issue presented by the evidence . . . ." [Citations.]' [Citation.] 'To protect this right and the broader interest of safeguarding the jury's function of ascertaining the truth, a trial court must instruct on lesser included offenses . . . whenever there is substantial evidence raising a question as to whether all of the elements of the charged offense are present.' [Citation.] Conversely, even on request, a trial judge has no duty to instruct on any lesser offense *unless* there is substantial evidence to support such instruction." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1007–1008.)

"[T]he existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense." (*People v. Breverman* (1998) 19 Cal.4th 142, 162 (*Breverman*).) Rather, " '[s]ubstantial evidence' in this

context is ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[]" ' that the lesser offense, but not the greater, was committed." (*Ibid.*; *People v. Cunningham*, *supra*, 25 Cal.4th at p. 1008.) "[S]ubstantial evidence to support instructions on a lesser included offense may exist even in the face of inconsistencies presented by the defense itself," and in particular even if "the defendant testifies to a state of mind inconsistent with the theory of a lesser included offense." (*Breverman*, at pp. 162–163 & fn. 10; *People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137–1138.)

We review de novo whether there was substantial evidence to warrant an instruction on a lesser included offense. (*People v. Manriquez* (2005) 37 Cal.4th 547, 584.) In doing so, we do "not evaluate the credibility of witnesses, a task for the jury," and "view the evidence in the light most favorable to the defendant." (*Breverman*, *supra*, 19 Cal.4th at p. 162; *People v. Millbrook*, *supra*, 222 Cal.App.4th at p. 1137.)

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) Involuntary manslaughter, a lesser included offense of murder, is "the unlawful killing of a human being without malice . . . [¶] . . . in the commission of an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." (§ 192, subd. (b); *People v. Cook* (2006) 39 Cal.4th 566, 596.) "[A]n unlawful killing in the course of [even] an inherently dangerous assaultive felony without malice" is a valid theory of involuntary manslaughter. (*People v. Brothers* (2015) 236 Cal.App.4th 24, 33–34; see *People v. Bryant* (2013) 56 Cal.4th 959, 970.) A trial court must instruct the jury on involuntary manslaughter "[i]f

13

the evidence presents a material issue of whether a killing was committed without malice." (*Cook*, at p. 596.)

On appeal, Garcia claims an instruction on involuntary manslaughter was required based on his "statements and testimony that he did not intend to kill but only to scare." He argues there was thus substantial evidence that he "did not intend to kill and did not therefore harbor malice." But an intent to kill is required only for express malice, not implied malice. (*People v. Soto* (2018) 4 Cal.5th 968, 976.) The required mind state for implied malice is a "conscious disregard that the natural and probable consequences of [the defendant's] act or actions were dangerous to human life." (*People v. Gonzalez* (2018) 5 Cal.5th 186, 197.) Garcia does not explain how a claimed intent to scare is incompatible with such a mind state. In other words, even if the jury credited his testimony that he intended only to scare, that testimony was not "evidence from which a reasonable juror could entertain a reasonable doubt that [he] had acted in conscious disregard of the risk [his] conduct posed to [Diaz's] life." (*People v. Brothers*, *supra*, 236 Cal.App.4th at p. 34.)

The primary case on which Garcia relies, *People v. Wilson* (1967) 66 Cal.2d 749 (*Wilson*), is inapposite. In that case, the defendant was convicted of two counts of murder after the jury was instructed on felony murder with burglary as the underlying felony. (*Id.* at pp. 752, 756.) The defendant testified that he entered the apartment where he shot the victims "with an intent to scare rather than to assault." (*Id.* at p. 757.) *Wilson* concluded that an instruction on involuntary manslaughter was warranted because if this testimony was credited, the defendant intended to commit only the crime of brandishing a firearm, a misdemeanor, not the crime of assault with a deadly weapon. (*Ibid.*) If so, "the felony-murder rule was

14

inapplicable," and the jury could have concluded "that the killing[s] occurred without malice in the commission of an unlawful act not amounting to a felony, a violation of section 417, which is involuntary manslaughter." (*Id.* at p. 758.)

Garcia does not explain how *Wilson* assists him except to say that the decision also involved "substantial evidence on which jurors could rely . . . to conclude that [the defendant] did not intend to kill and did not therefore harbor malice, but instead intended only to scare [the victim or victims]." As we have explained, Garcia's premise that malice requires an intent to kill is unsound because it ignores the possibility of implied malice, and *Wilson* did not address implied malice. Thus, although we agree with Garcia that "the technical classification [of the underlying act] as a misdemeanor or felony does not matter" under the circumstances of this case, the problem remains that he fails to point to any evidence from which a jury could entertain a reasonable doubt about whether in stabbing Diaz he acted with conscious disregard for life, and therefore conclude he committed involuntary manslaughter but not murder.[3] (See *Breverman, supra,* 19 Cal.4th at p. 162.) Accordingly, Garcia fails to demonstrate that the trial court erred by refusing to instruct the jury on involuntary manslaughter.

Finally, any error was harmless because "there is no reasonable probability that, had the jury been instructed on involuntary manslaughter," any of its members "would have chosen that option."[4] (*People v. Rogers*

---

[3] Notably, Garcia does not argue on appeal that there was substantial evidence that he killed Diaz while unconscious due to voluntary intoxication and was therefore guilty of only involuntary manslaughter. (See *People v. Ochoa* (1998) 19 Cal.4th 353, 423.)

[4] Garcia does not claim that prejudice from such an error must be assessed under the federal standard of *Chapman v. California* (1967) 386 U.S. 18, 24. "[I]n order to preserve the right to seek subsequent review,"

15

(2006) 39 Cal.4th 826, 884.) We agree with Garcia that his "mental state was central to this case" and there was conflicting evidence on whether he harbored an intent to kill. But we disagree that either the ultimate verdict or a jury question about lying in wait suggest the possibility that the jury concluded he acted without malice.

The jury was instructed under CALCRIM No. 521 that Garcia was guilty of first degree murder if he "murdered while lying in wait or immediately thereafter." (See § 189, subd. (a).) During deliberations, the jury asked whether "lying in wait need[s] to include intent to kill or intent to harm," to which the trial court correctly responded, " 'Lying in wait' does not necessarily need to include intent to kill but it must at least include implied malice: at the time he acted the defendant knew his act was dangerous to human life and he deliberately acted with conscious disregard for human life." (See *People v. Stanley* (1995) 10 Cal.4th 764, 794; *People v. Laws* (1993) 12 Cal.App.4th 786, 793–794.) Garcia posits that having been so instructed, the jury "would have convicted of first degree murder under the . . . lying in wait theory" had it determined that he acted with either express or implied malice. We do not follow Garcia's logic. The evidence to support lying in wait, a theory that required the jury to conclude that Garcia "concealed his purpose from the person killed," "waited and watched for an opportunity to act," and "from a position of advantage, . . . intended to and did make a surprise attack on the person killed," was not so overwhelming that the jury was compelled to accept it if it concluded he acted with implied malice. Moreover, the jury was instructed under CALCRIM No. 520 that it had to find that Garcia acted with express or implied malice to convict him of

he does argue that the alleged error is reversible per se. Governing precedent forecloses this argument, and we do not address it.

16

murder, undermining the conclusion that it found he acted *without* malice. Accordingly, there is no reasonable probability that the jury would not have convicted him of murder had it been instructed on involuntary manslaughter.

> B. *The Trial Court Correctly Declined to Instruct the Jury on Perfect and Imperfect Self-defense.*

Garcia also claims that the trial court erred by denying his request for instructions on perfect and imperfect self-defense. Again, we are not persuaded.

Garcia requested jury instructions on perfect and imperfect self-defense. The trial court denied the request, finding there was no substantial evidence that Garcia "believed he was in imminent danger of being killed or suffering great bodily injury before he stabbed [Diaz]." The court observed that the only possible theory by which Garcia acted in self-defense was that after Diaz hit him with the bottle, he returned to the yellow Mustang and "then grabbed the knife from the door and stabbed [Diaz] in response." But according to the court, this theory was undermined by the physical evidence: "It is belied by the blood that was found on the phone that's in [Diaz's] car; it's belied by the copious amount of blood that is found around the memorial; it's belied, by some extent, . . . by the fact that [Diaz's] blood was found on the broken bottle, which was within the defendant's car, . . . showing the blood could have only come from the stab wound."

"An unlawful killing involving either an intent to kill or a conscious disregard for life constitutes voluntary manslaughter, rather than murder, when the defendant acts upon an actual but unreasonable belief in the need for self-defense. [Citations.] In addition, a homicide is justifiable and noncriminal where the actor possessed both an actual and reasonable belief in the need to defend. [Citations.] In either case, 'the fear must be of imminent harm. "Fear of future harm—no matter how great the fear and no

17

matter how great the likelihood of the harm—will not suffice.  The defendant's fear must be of *imminent* danger to life or great bodily injury." ' "  (*People v. Stitely* (2005) 35 Cal.4th 514, 551; *People v. Sotelo-Urena* (2016) 4 Cal.App.5th 732, 744.)

Again, we review de novo whether there was substantial evidence to support giving the requested instructions.  (*People v. Manriquez, supra,* 37 Cal.4th at p. 584; *People v. Stitely, supra,* 35 Cal.4th at p. 551.)  Thus, although Garcia claims the trial court erred by refusing to instruct on self-defense "because there happened to be evidence in the record which 'contradict[ed]' the defense position," the correctness of the court's reasoning plays no role in our analysis.

Garcia claims there was substantial evidence he acted in self-defense based on his "own testimony that Diaz . . . struck the first blow" without provocation.  Garcia also points to the evidence that he had a "generally peaceful nature," knew Diaz was a violent person, based both on prior encounters and information S.E. and her mother reported, that he himself sustained "severe injuries" during the fight, and that Diaz was "considerably larger" than he.

None of this evidence, including Garcia's testimony that Diaz attacked him first, was sufficient to establish that Garcia had an actual belief in the need to use deadly force to defend himself.  (See *People v. Sotelo-Urena, supra,* 4 Cal.App.5th at p. 744.)  Garcia claims in his briefing that "he testified he [stabbed Diaz] in fear for his life."  The record does not support this assertion.  Rather, Garcia testified that while he remembered exchanging blows with Diaz, he could not remember having a knife or stabbing the other man.  And if this testimony was accepted, it did not

demonstrate that Garcia was aware he used deadly force against Diaz at all, much less that he believed deadly force was necessary.

In turn, other than Garcia's trial testimony, there was no evidence to support the conclusion that Diaz attacked Garcia first. Notably, although S.E. testified that the two men were already fighting when she came outside, the only reasonable interpretation of her testimony is that Diaz had already been stabbed by then, as she did not see him get stabbed and he was already bleeding. In our view, no reasonable juror could have believed Garcia's testimony that Diaz attacked first but also rejected Garcia's claim that he did not remember stabbing Diaz, as well as all the other evidence that Garcia stabbed Diaz first, to conclude that Garcia actually believed in the need to use deadly force. Accordingly, instructions were not warranted on either perfect or imperfect self-defense. (See *People v. Simon* (2016) 1 Cal.5th 98, 134.)

Even if the trial court had erred in denying Garcia's request for self-defense instructions, it is not reasonably probable that Garcia would have obtained a better result had the jury been so instructed (*People v. Watson* (1956) 46 Cal.2d 818, 836), and the omission was harmless beyond a reasonable doubt (*Chapman v. California*, *supra*, 386 U.S. at p. 24). As we have said, the only evidence that Diaz attacked Garcia first was Garcia's trial testimony. But Garcia told police he stabbed Diaz first, and both S.E. in her statements to police and Shawn B. in his testimony said that Garcia attacked Diaz while Diaz was still in his car. In addition, the physical evidence, including Garcia's palm print on the door of Diaz's car and the blood at the scene, strongly supported the conclusion that Garcia instigated the fight. Thus, even if Garcia's testimony had sufficed to require self-defense

19

instructions, that testimony was decisively undermined by the balance of the evidence before the jury.

C.      *The Trial Court's Refusal to Let Garcia's Counsel Reargue After It Altered a Jury Instruction Does Not Require Reversal.*

Garcia also claims the trial court denied him his right to effective assistance of counsel by refusing to let his trial counsel reargue after the court decided to change one of the jury instructions on murder. We conclude that any error was harmless.

1.      Additional facts

The prosecution requested CALCRIM No. 520 on murder with malice aforethought. As applicable here, the standard instruction provides that to prove a defendant is guilty of murder, the People must prove that (1) "[t]he defendant committed an act that caused the death of . . . another person"; and (2) "[w]hen the defendant acted, [he] had a state of mind called malice aforethought." (CALCRIM No. 520.) In addition, the instruction has an optional third element that the defendant "killed without lawful (excuse/[or] justification)," which is given "when instructing on justifiable or excusable homicide." (*Ibid.*) As discussed above, the trial court declined to instruct on self-defense, the only potentially applicable theory of justification. Nevertheless, the version of CALCRIM No. 520 in the instruction packet the court gave to the parties before closing arguments included the optional third element.

After the trial court ruled that self-defense instructions would not be given, Garcia's trial counsel stated, "Just so I understand, self-defense is an implied element of the crime. Am I to not address—is that element being eliminated by the Court's ruling today?" The court responded, "No self-defense instructions are going to be given." Defense counsel sought to confirm that "self-defense is not going to be given to the jury for

20

consideration, so [he could not] touch it." The court responded, "Well, as mentioned, you are free to argue that an intent to kill and implied malice did not exist, and you may make that argument, so to that step, I suppose you can touch it."

Having received the packet with the optional third element included in CALCRIM No. 520, both parties referred to lawful justification in their closing arguments. The prosecutor argued at the outset that "what happened to [Diaz] on May 27, 2016, was not just, and it was not lawful." She later told the jury, "Murder, as defined in [CALCRIM No.] 520, requires three elements that I have to prove. The first element is that the defendant committed an act that caused the death of another person. The second is that when the defendant acted, he had a state of mind called malice aforethought. . . . And the third is that he killed without lawful justification."

In his closing argument, defense counsel also addressed the element of an absence of lawful justification. After noting that there was "no further definition in this instruction packet about what lawful justification means," counsel gave as examples soldiers or law enforcement officials killing in the course of their duties. Counsel continued, "If someone is in your house going after your children, you can defend them. We don't have to lie and wait for the State to protect us. It's fundamental. It's enshrined within the Second Amendment. It's part of due process. Self-defense is a fundamental human right."

The prosecutor immediately objected, and the trial court addressed the jury as follows: "Ladies and gentlemen, as I've told you before, the law of self-defense is not an issue in this case, and so you should not be influenced in your decision as to what you think the law of self-defense might be." The following exchange then occurred:

21

| | |
|---|---|
| "[DEFENSE COUNSEL]: | You've got to decide what justification means for you, then, because it's not in the instructions at all. |
| "[PROSECUTOR]: | Objection, improper argument. |
| "[DEFENSE COUNSEL]: | It's an element. |
| "THE COURT: | It's an element, but if it's not shown by the evidence, then it's an element that is not in issue. |
| "[DEFENSE COUNSEL]: | Are you instructing the jury that the element is satisfied beyond a reasonable doubt, Your Honor? |
| "THE COURT: | I'm saying that the [jurors are] to confine themselves to the evidence, and if there's no evidence of justification, then they are to decide accordingly. |
| "[DEFENSE COUNSEL]: | Think in your hearts about the facts in this case. Think about the fact that you cannot be impeached for your verdict. Justification is an element. It means something. There's an instruction in there that tells you that justification—if the word isn't defined it has its common meaning. You know if you are justified you are doing the right thing." |

Defense counsel then argued that Garcia was entitled to "repel that attack, that is justification," if Diaz attacked him first and he was losing the fight and retreating. The prosecutor objected twice to this line of argument, but the trial court overruled both objections. In conclusion, defense counsel urged that the evidence as a whole did not "rule out justification beyond a reasonable doubt."

In rebuttal, the prosecutor argued, "[T]he defense argument that this was justified . . . is not supported by the law or by the facts as you heard them. The defense argument is an attempt to shoehorn self-defense into this case when you are not getting those instructions [and] is inapplicable and inappropriate." Defense counsel objected that "justification is an element," and the trial court overruled the objection.

The prosecutor continued by explaining to the jury that "[a]ll of the law that applies to this case will be given to you. And that is the only law that applies. It would not be fair or just in any circumstance for juries to speculate about what would be justified for them to do, so it's okay for the defendant to do—" The defense unsuccessfully objected again, and the trial court stated, "Ladies and gentlemen, I have determined that justification is not an element in this case because there's no evidence supporting it. So, in deciding the case, you are to be governed by the evidence, not by what you think I should have done or what [defense counsel] thinks I should have done. You're to base your decision on the evidence in the case."

After closing arguments were finished, the trial court told counsel it had "made a mistake" by including the optional third element in CALCRIM No. 520. The court stated it intended to eliminate that element from the instruction it would give to the jury. Defense counsel responded, "Your Honor, given that that was the thrust of my argument, the Court is literally eviscerating the entire defense after I gave the argument. The Court could have called me forward to address that in the first instance at my mention of justification as an element. I've never—I'm completely undermined, and my client's denied effective assistance of counsel and due process by such a move."

23

The trial court responded that it did not believe the defense was "prejudiced," because the ruling that no self-defense instructions would be given was clear, and CALCRIM No. 520 also clearly stated that the third element should not be given unless the jury was instructed on self-defense. Defense counsel asked whether the court could see how it "completely undermined what [he] just did," and the court responded, "No, I don't, because I think you jumped on what was a mistake and used that as a desperate attempt to fashion a defense. And I don't believe that the jury, within the facts of this case, [is] going to be misled in any way if I do not include that as an element."

Defense counsel denied he had intentionally taken advantage of the trial court's mistake and asked for the opportunity to reargue. Counsel stated that he had interpreted the third element's inclusion to be the court's direction about how to address self-defense within the parameters of its prior rulings. Counsel asked that the court tell the jury "that the instructions that [he] was given contained justification and now [the court is] removing [that element]" so that the jurors would not "think that [he] invented an element for [his] entire argument," which would cause him "to lose all credibility through the Court's mistake." The court agreed to tell the jurors that it had mistakenly included the third element in the instruction packet it gave to both counsel.

Subsequently, Garcia moved for the trial court to reconsider its decision not to instruct on self-defense and the element of an absence of lawful justification, and he also asked for 20 minutes "to explain what happened and why what he said . . . applies to malice." The court denied the motion for reconsideration and declined to permit counsel to reargue. Counsel then asked the court to "indicate that everything [he] said that was directed at

24

justification should be considered as argument against a malice element." The court also declined this request, saying this would be clear when it explained its mistake.

Defense counsel reaffirmed his belief that the trial court's rulings denied Garcia a fair trial. Although counsel recognized that the situation was accidental, he stated that he "fe[lt] very sorely used in this scenario" and his "argument would have been [dramatically] different had [he] understood what the Court meant." The trial court responded that its rulings on self-defense and the meaning of CALCRIM No. 520 were "plain," and it "[couldn't] believe that [counsel] didn't know" that the third element "is only to be given when instructing [on] justifiable or excusable homicide." Counsel responded, "What I can't believe, Your Honor, is when you told me that I could argue self-defense as to malice, because obviously [it's] black letter law that one who kills in self-defense has actual malice, so it's not relevant to malice. It's only relevant to justification. So the Court, I believe, has made a grievous error and denied my client a fair trial."

In instructing the jury the next day, the trial court gave the following admonition: "[CALCRIM No. 520] does not as an element include that the defendant killed without lawful justification, such as in self-defense. Due to a mistake on my part, the written instruction that I gave to counsel before arguments included the element that the defendant killed without lawful justification. Because of this, the defense was led to argue that no lawful justification was an element of murder. This was due to my mistake and you should not blame the defense for making the argument. There still must be proof beyond a reasonable doubt of malice aforethought to prove murder of either degree or voluntary manslaughter."

2. Analysis

Initially, Garcia does not contest that the trial court was entitled to revise CALCRIM No. 520 to eliminate the optional third element after it had already provided the instruction to counsel. In general, "[b]efore the commencement of the argument," a trial court must "advise counsel of all instructions to be given. However, if, during the argument, issues are raised which have not been covered by instructions given or refused, the court may, on request of counsel, give additional instructions on the subject matter thereof." (§ 1093.5.) A trial court has a duty to instruct on all applicable points of law, and it is therefore entitled to modify an instruction "to dispel confusion and correctly advise the jury on the law governing the case." (*People v. Ardoin* (2011) 196 Cal.App.4th 102, 128 (*Ardoin*), disapproved on other grounds in *People v. Dalton* (2019) 7 Cal.5th 166, 214.) Given that we have affirmed the court's decision not to instruct on self-defense, Garcia also concedes that the court properly deleted the third element of CALCRIM No. 520.

Rather, the thrust of Garcia's claim is that it "was fundamentally unfair" to deny his trial counsel the chance to reargue after CALCRIM No. 520 was altered. " 'The Sixth and Fourteenth Amendments to the United States Constitution and article I, section 15 of the California Constitution guarantee a criminal defendant the right to the effective assistance of counsel at all critical stages of the proceedings.' [Citation.] ' "To effectuate the constitutional rights to counsel and to due process of law, an accused must . . . have a reasonable opportunity to prepare a defense and respond to the charges." [Citation.]' [Citation.] If supplemental or curative instructions are given by the trial court without granting defense counsel an opportunity to object, and if necessary, offer additional legal argument to respond to the

26

substance of the new instructions, the spirit of section 1093.5 and the defendant's right to a fair trial may be compromised." (*Ardoin*, *supra*, 196 Cal.App.4th at p. 129.)

Assuming, without deciding, that the trial court should have granted Garcia's request to reargue (see *Ardoin*, *supra*, 196 Cal.App.4th at p. 129), we conclude the error was harmless. We agree with Garcia that in assessing prejudice from this type of error, we focus on the error's effect on counsel's closing argument, not the strength of the evidence presented at trial.[5] Such an error "requires reversal only if, viewing the record in its entirety, a party ' "was unfairly prevented from arguing [the party's] defense to the jury or was substantially misled in formulating and presenting arguments." [Citation.]' [Citations.] 'The question is whether this court can "conclude that the effectiveness of counsel's argument and hence of [the] defense was not impaired by counsel's inaccurate information regarding the court's charge." ' " (*Id.* at p. 134; see *United States v. Gaskins* (9th Cir. 1988) 849 F.2d 454, 460; *United States v. Harvill* (9th Cir. 1974) 501 F.2d 295, 297 (per curiam).)

Garcia argues that reversal is required under this standard because "the thrust of defense counsel's closing argument centered around [Garcia's] actions being justified that fateful evening." Counsel spent a fair amount of time arguing the justification issue, and the record is clear that he did so in reliance on his belief the jury would be instructed on the optional third element of CALCRIM No. 520. This reliance potentially harmed Garcia's case in two respects: by causing counsel to include an argument on justification that he would not have otherwise, damaging his credibility with

---

[5] We disagree with Garcia, however, to the extent he suggests that prejudice is therefore "presumed" and he does not have the burden on appeal to demonstrate it.

the jury, and by causing counsel to omit other arguments that he might have pursued otherwise, weakening the chance for a more favorable verdict.

We are unconvinced that the refusal to allow defense counsel to reargue actually resulted in either type of harm. In our view, the trial court adequately addressed the first type of potential harm by explaining to the jury that counsel's argument about justification was due to the court's own error and should not be held against the defense. Even if counsel's justification-based argument would have otherwise caused him to lose credibility with the jury, the court's explanation absolved counsel of blame. This explanation, which expressly addressed the change in instructions, distinguishes this case from other decisions cited by Garcia in which a lower court's post-argument decision not to give its indicated instructions was held prejudicial. (*United States v. Harvill*, *supra*, 501 F.2d at pp. 296–297; *People v. Sanchez* (1978) 83 Cal.App.3d Supp. 1, 4–7.) Indeed, Garcia admits that the court's explanation "could have ameliorated somewhat the damage to defense counsel's credibility," and he does not suggest that this type of harm could not be cured by further instruction or explain why what the court did say was wanting.

As for the second type of potential harm, the omission of other arguments, Garcia fails to demonstrate it. While defense counsel represented that his closing argument would have been significantly different had he known the third element would be omitted from CALCRIM No. 520, on appeal Garcia does not identify *how* it might have been different. The viable theories on which the jury was instructed that were closest to the barred self-defense argument were based on provocation, which if found would reduce murder from either first degree to second degree or to voluntary manslaughter based on a sudden quarrel or heat of passion. (See CALCRIM

28

Nos. 522, 570.)  As the Attorney General points out, counsel in fact argued provocation and lack of malice at length, and the jury was persuaded to acquit Garcia of first degree murder.  We fail to see how the closing argument "would have appreciably differed or been any more persuasive" had counsel been permitted to reargue, and Garcia was not prevented from effectively presenting a defense.  (*Ardoin*, *supra*, 196 Cal.App.4th at p. 134.)  Therefore, his claim fails.

D.    *The Prosecutor Did Not Err in Closing Argument.*

Garcia contends that the prosecutor committed misconduct by arguing to the jurors in closing "that where there has been a killing, [they] should 'start the analysis' at second degree murder."  We are not persuaded.

During closing argument, the prosecutor explained to the jury that "[a]ll murders start off at second degree."  She continued, "And then they are elevated to a first degree murder by aggravation, and the law lays out what sort of aggravation that is here, lying in wait, premeditation, and deliberation. . . .  Or, it is lower and mitigated to manslaughter by a defense articulated in the law, and only by defenses that are articulated in the law. [¶] So, if you find a dead body l[]ying in the gutter with a bullet wound to the back of the[] head, that's a second degree as you start the analysis."  The defense's objections to this argument were overruled.

" '[T]he term prosecutorial "misconduct" is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind.  A more apt description of the transgression is prosecutorial error.' [Citation.]  Such error occurs, as a matter of state law, when a prosecutor 'engage[s] in deceptive or reprehensible tactics in order to persuade the trier of fact to convict.'  [Citation.]  Federal constitutional error occurs only when the prosecutor's actions 'comprise a pattern of conduct that is serious and

29

egregious, such that the trial is rendered so unfair that the resulting conviction violates the defendant's right to due process of law.' " (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 853–854.)

" ' " '[I]t is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements.' " ' [Citation.] When a claim of prosecutorial error ' "focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." ' " (*People v. Doane* (2021) 66 Cal.App.5th 965, 976.) "We consider the assertedly improper remarks in the context of the argument as a whole," and " 'we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*People v. Covarrubias* (2016) 1 Cal.5th 838, 894.)

Garcia claims the prosecutor "undercut the state's burden of proof and [the] presumption of innocence" by telling jurors that "on[c]e there was a killing, they should 'start the analysis' at second degree murder," and specifically should do so under the hypothetical offered. Garcia argues that "[m]erely finding a dead body with a bullet wound to the head does not automatically result in a second degree murder conviction. . . . [I]n order to [return] a murder conviction, jurors must find beyond a reasonable doubt that the state has proven the killing was unlawful and with malice. [Citation.] There is no presumption which excuses the state from meeting this burden and permits jurors to simply assume an unlawful killing with malice, start from that point, and look for aggravation (to convict of first degree murder) or mitigation (to convict of manslaughter)."

30

We conclude the trial court properly overruled the defense's objections to the prosecutor's argument, because there is no reasonable likelihood that the argument misled the jury. (See *People v. Doane, supra*, 66 Cal.App.5th at p. 976.) Taken out of context, the prosecutor's statements could technically be interpreted to suggest that the jury could presume a murder occurred without proof of malice. But we agree with the Attorney General that reasonable jurors would have understood the argument to address the analysis once they concluded that an unlawful homicide occurred, "and that it did not mean that they could avoid the process of evaluating the evidence in light of the instructions." On that score, the jury was properly and fully instructed on the presumption of innocence, the prosecution's burden of proof, reasonable doubt, and the elements of murder. Garcia does not argue otherwise.

Moreover, immediately after making the challenged remarks, the prosecutor made clear that "[s]econd degree murder requires malice" and the state had the burden of proving that element. In particular, she tied her explanation to the challenged hypothetical, stating, "[E]xpress malice in this case is pretty obvious where you take a deadly weapon and stab someone in a vital part of the body, that is an intent to kill. Just like if you took a gun and shot someone in the head, that is an intent to kill, even if you don't say what you are trying to do. That's express malice." In light of this argument, no reasonable juror could have believed that it could convict Garcia of murder even if the state had not proven malice beyond a reasonable doubt.

E.     *No Cumulative Error Appears.*

Finally, Garcia claims that even if the errors he alleges are harmless standing alone, collectively they require reversal. We have concluded that the trial court properly declined to instruct the jury on involuntary

31

manslaughter and self-defense principles, and the prosecutor did not err in closing argument.  And although we assumed that the court should have permitted defense counsel to reargue after altering CALCRIM No. 520, that error was harmless for the reasons already given.  Accordingly, there is no cumulative error requiring reversal.

## III.
### DISPOSITION

The judgment is affirmed.

_____

Humes, P.J.

WE CONCUR:

_____

Margulies, J.

_____

Sanchez, J.

*People v. Garcia*  A157727

33