Filed 3/6/26  P. v. Garcia CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### COURT OF APPEAL, FOURTH APPELLATE DISTRICT

### DIVISION ONE

### STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>VICTORIA GARCIA,<br><br>    Defendant and Appellant. | D085446<br><br><br>(Super. Ct. No. FSB22001636) |

APPEAL from a judgment of the Superior Court of San Bernardino County, Rafael A. Arreola, Judge.* Affirmed.

Debbie Yen, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Daniel J. Hilton, Deputy Attorneys General, for Plaintiff and Respondent.

---

\*      Retired Judge of the San Diego Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Based on a story that can be fairly characterized as bizarre, a jury convicted Victoria Garcia of felony assault with a deadly weapon after she pointed a steak knife at her boyfriend, who she erroneously thought was planning to kill her. She appeals her conviction on grounds of insufficient evidence and the trial court's omission of jury instructions on (1) the complete defense of unconsciousness and (2) the misdemeanor offense of brandishing a deadly weapon. Garcia also requests that we strike a search condition of her probationary sentence due to trial counsel's alleged ineffective assistance in failing to object to it. Finding no basis in the record to assign prejudicial error to the trial court or deem counsel's performance deficient, we affirm Garcia's conviction and leave the search condition intact.

## FACTUAL AND PROCEDURAL BACKGROUND

On June 3, 2022, Garcia and her boyfriend, Jacob N., began what was supposed to be a romantic weekend getaway at a cabin near Big Bear Lake. While making and eating supper on the second night of their stay, Garcia and Jacob smoked part of a joint they legally purchased from a local marijuana delivery service. Garcia lit the joint and took "three or four pulls" before passing it to Jacob who took one or two hits. They did not smoke any more during dinner.

Jacob did not notice anything unusual about the smell of the marijuana they were smoking. He was affected "[a] little bit for sure, but nothing where [he] was high out of his mind," and his senses were all "fine" and "normal."

After dinner, Garcia smoked more of the joint. This is when Jacob "started noticing a couple of odd things." "[K]ind of under her breath," Garcia told Jacob that he was "disgusting," that she knew he took her to the cabin to "sacrifice" her, and that she thought he was talking to "spirits and entities."

2

Garcia also complained that her stomach hurt, something Jacob had not heard her say when they smoked marijuana together before.

A short time after making these statements, Garcia picked up a steak knife she had placed on the kitchen island and pointed it toward Jacob (first steak knife incident). Garcia did not make any jabbing or slashing movements with the knife, nor did she say anything to Jacob while she was pointing the knife at him. Nevertheless, Jacob thought that Garcia, who was about six feet away, could stab him if she were to lunge in his direction. Jacob was also "freaked out" because he felt "like there was some sort of underlying influence demonically" or some sort of "dark presence . . . in the air."

In that moment, Jacob believed he had to "get out of there." He retreated to the bedroom, but Garcia followed him at the same distance while still pointing the knife at him.[1] Jacob jumped on the bed and used a pillow to shield his torso. He eventually persuaded Garcia to put the knife down. Even though things were "mellow and calm again" when they left the bedroom, Garcia stopped Jacob when he tried to leave the cabin.

Instead of physically confronting Garcia and potentially escalating the situation, Jacob decided to barricade himself in the loft. He could see from above that Garcia had picked up the steak knife and was making downward stabbing motions with it while looking up at him and restating her belief that he was going to sacrifice her. Garcia later retrieved a larger chef's knife and told Jacob that she knew he was going to kill her but that she was going to

---

[1]	The cabin's only entry door opened into the kitchen on the first floor. To the right of the kitchen was a den, and behind those two rooms were a bedroom and a bathroom. There was also an upstairs loft that overlooked the kitchen.

kill him first. From Jacob's perspective, Garcia seemed "demonically possessed."

While in the loft, Jacob became "really freaked out" when the cabin suddenly began to "smell[] like rotten eggs, sulfur." A few moments later, he claimed to have seen floating over Garcia's shoulder an image of Santa Muerte (Spanish for "Saint Death"), an unofficial saint depicted as a female grim reaper. (See Miera-Rosete, *Officers At The Gate: Why* United States v. Medina-Copete *Should Be The Rule And Not The Exception* (2017) 47 N.M. L.Rev. 184, 192.) According to Jacob, this vision looked similar to the picture of Santa Muerte he noticed earlier was saved as the lockscreen on Garcia's phone. Jacob denied having hallucinated this smell or vision.

Garcia remained on the ground floor of the cabin for approximately three hours while Jacob was in the loft. Shortly before 3:00 a.m. on June 5, Jacob decided to jump out of a second-story window and ran to a nearby house, convincing the neighbor to call 911. San Bernardino County Sheriff's deputies responded and took Garcia into custody after a three-hour standoff. Based on the first steak knife incident, Garcia was convicted by jury in May 2024 of felony assault with a deadly weapon (ADW) (Pen. Code,[2] § 245, subd. (a)(1) (§ 245(a)(1)).[3] In a bifurcated trial, the judge made a true finding that the crime involved great violence, great bodily harm, threat of bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness. Garcia was sentenced to three years of supervised probation.

---

[2] Subsequent undesignated statutory references are to the Penal Code.

[3] ADW is a "wobbler"—it is "chargeable or, in the discretion of the court, punishable either as a felony *or* misdemeanor." (*People v. Park* (2013) 56 Cal.4th 782, 789–790.) Garcia was charged with a felony, and her motion to treat the offense as a misdemeanor was denied.

## DISCUSSION

### A. *Sufficiency of the Evidence*

To convict Garcia of ADW in violation of section 245(a)(1), the People had to establish beyond a reasonable doubt that she willfully "did an act with a deadly weapon that by its nature would directly and probably result in the application of force to a person," that she was "aware of facts that would lead a reasonable person to realize that her act by its nature would directly and probably result in the application of force to someone," and that she "had the present ability to apply force with a deadly weapon." (CALCRIM No. 875; accord §§ 240, 245(a)(1).) Although Garcia does not dispute that a steak knife *can* be a dangerous weapon, she claims the evidence failed to show she used one in a way that put Jacob in any danger. The People respond that Jacob's testimony about his and Garcia's actions before, during, and after the first steak knife incident, considered in the light most favorable to the judgment, adequately supported the conviction.

When resolving a challenge to the sufficiency of the evidence in a criminal case, "we do not determine the facts ourselves" nor do we "reweigh evidence or reevaluate a witness's credibility." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1129 (*Guerra*).) "Rather, we 'examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*Ibid.*) "We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*Ibid.*) " '[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the

5

circumstances might also reasonably be reconciled with a contrary finding.' " (*Ibid.*)

A "deadly weapon" under section 245(a)(1) "is 'any object, instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury.' " (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1028 (*Aguilar*).) "Some few objects, such as dirks and blackjacks, have been held to be deadly weapons as a matter of law; the ordinary use for which they are designed establishes their character as such." (*Id.* at p. 1029.) "Other objects, while not deadly per se, may be used, under certain circumstances, in a manner likely to produce death or great bodily injury." (*Ibid.*) "Because a knife can be, and usually is, used for innocent purposes, it is not among the few objects that are inherently deadly weapons." (*People v. Aledamat* (2019) 8 Cal.5th 1, 6.) "In determining whether an object not inherently deadly or dangerous is used as such, the trier of fact may consider the nature of the object, the manner in which it is used, and all other facts relevant to the issue." (*Aguilar*, at p. 1029; CALCRIM No. 875 [as given here, instructing that "[i]n deciding whether an object is a deadly weapon, consider all the surrounding circumstances"].)

A "present ability to apply force with a deadly weapon" exists when " 'a defendant has attached the means and location to strike immediately.' " (CALCRIM No. 875; *People v. Chance* (2008) 44 Cal.4th 1164, 1174.) "[I]t is a defendant's action enabling him to inflict a present injury that constitutes the actus reus of assault." (*Chance*, at p. 1172.) Because "[t]here is no requirement that the injury would necessarily occur as the very next step in the sequence of events, or without any delay" (*ibid.*), " 'immediately' " means an injury "is threatened on the present occasion" (*id.* at p. 1174). Accordingly, " '[t]here need not be even a direct attempt at violence; but any

6

indirect preparation towards it, under the circumstances mentioned, such as drawing a sword or bayonet, or even laying one's hand upon his sword, would be sufficient.' " (*Id.* at p. 1172.)

Against this backdrop, the evidence was sufficient for a reasonable juror to find all elements of ADW beyond a reasonable doubt. After smoking more of the marijuana on June 4, Garcia behaved as if she believed Jacob presented a physical threat to her. She responded by picking up a steak knife she had placed on the kitchen island earlier, pointing it at Jacob while within striking distance of him, and maintaining this posture while he retreated to the bedroom. Evidently afraid of Garcia's present ability to injure him, Jacob jumped on the bed and used a pillow to shield his torso. He then tried to leave the cabin after he persuaded her to put the knife down, and, failing in that effort, barricaded himself in the loft. The fact that Jacob was successful in deescalating the first steak knife incident supports an inference that Garcia was aware a reasonable person would view the act as likely resulting in the use of force.

Keeping in mind the deferential standard of review, we are not persuaded by Garcia's efforts to minimize the significance of the evidence. At a general level, she argues that picking up a knife and pointing it at someone a few feet away would be an ADW only if she contemporaneously exhibited menacing behavior—such as making verbal threats or aggressive gestures such as slashing or stabbing—which did not occur here. She derives this proposition from the observations by some appellate courts of threatening behavior by defendants whose convictions for assaults involving knives or

7

sharp instruments they upheld.[4]  Although evidence of similar threats by Garcia might have strengthened the People's case, we have neither been provided with nor located any cases indicating that such evidence was essential for a conviction.  On the contrary, the jurors were correctly instructed that the prosecution was "not required to prove that [Garcia] actually intended to use force against someone when [she] acted" (see CALCRIM No. 875), which is what these additional acts would have established (cf. *Chance, supra,* 44 Cal.4th at p. 1172).

On a more granular level, Garcia argues that Jacob's testimony was not credible because he also smoked the marijuana she blames for her paranoid behavior.  According to Garcia, Jacob's testimony was embellished based on this presumed paranoia and the fact that he experienced visual and olfactory sensations while in the loft that must have been hallucinations.  But there was no evidence Jacob either felt any effects of the marijuana or was hallucinating during the first steak knife incident.  In any event, we do not second-guess jurors' credibility determinations or resolutions of competing inferences.  (*Guerra, supra,* 37 Cal.4th at p. 1129.)  Likewise, we may not reverse the judgment based on Garcia's argument on appeal that the jury should have realized there were innocent explanations for some of her

---

[4]     For example, *People v. McCoy* (1944) 25 Cal.2d 177, 182 [telling victim, while holding a knife a few inches away from her face and covering her mouth, " 'Don't make any noise or I'll use this knife' "]; *In re Raymundo M.* (2020) 52 Cal.App.5th 78, 87–88 ["rather than merely brandish the [switchblade] knife [with its blade exposed] while standing still, Raymundo lunged and ran toward I.S. from 10 to 12 feet away"]; *People v. Nguyen* (2017) 12 Cal.App.5th 44, 46–47 [defendant advanced toward police from more than 10 feet away while holding a 12- to 15-inch knife he refused to drop]; *People v. Page* (2004) 123 Cal.App.4th 1466, 1473 [holding a sharpened pencil to the victim's neck while threatening to stab him].

behavior, such as that it is natural to pick up a steak knife while in a kitchen. (*Ibid.*)

In short, while reasonable jurors might have reached different conclusions, there was evidence from which they could properly find that Garcia's actions during the first steak knife incident constituted an assault with a deadly weapon.

## B. *Jury Instruction on Unconsciousness*

### 1. *Additional Background*

Garcia's main defense theory was that she could not be liable for assault because, unbeknownst to her, the marijuana she and Jacob smoked was laced with some other substance, possibly a hallucinogen like PCP.[5] Because Garcia did not put on an affirmative case, she supported this theory with Jacob's testimony that her conduct after smoking the marijuana on June 4 was out of character, that he experienced his own sensations which she believed were hallucinations, and that he testified about her lack of ability to remember some of the events occurring on those dates when he asked her about them after her arrest.

Garcia also supported this theory with testimony of Sergeant Abernathy, a responding deputy who had experience and training in recognizing different drugs and their effects. When Sergeant Abernathy arrived on the scene at around 3:00 a.m. on June 5, Garcia was holding knives while walking around the cabin. For the next three hours, he and

---

[5] A hallucination may be "sensory perception that occurs in the absence of an actual external stimulus" or "an unfounded or mistaken impression or notion." (Merriam-Webster's Online Dict. (2026) <https://www.merriam-webster.com/dictionary/hallucination> as of March 4, 2026, archived at <https://perma.cc/2T25-9XZC>.)

other deputies unsuccessfully tried to coax Garcia out of the cabin. Garcia at times would be "lucid" but at others would "speak[] in tongues," use "nonsense words," and say "weird stuff."

In Sergeant Abernathy's judgment, Garcia's behavior was "so erratic, so bizarre that it had to be the result of being under the influence of [a] controlled substance." He also testified that, in his experience, a person going through a mental health episode might show this same behavior, but he also posited that if "she was just mentally ill or something like that, she wouldn't have been in that situation." The standoff ended when deputies forced Garcia from the cabin by shooting pepper spray through a back window. Garcia's appearance was "normal" when deputies arrested her.

On cross-examination, Sergeant Abernathy acknowledged that he had heard of persons dipping the tips of joints "into a powerful hallucinogen, like PCP." He conceded that the first and second person who smoked a joint treated in that manner might experience hallucinations or paranoia. But when pressed, Sergeant Abernathy would not agree that Garcia's behavior indicated the ingestion of something other than marijuana.[6]

The only drug deputies found in the cabin was marijuana, which they did not test because there was nothing unlawful about its possession. (*People v. Whalum* (2020) 50 Cal.App.5th 1, 6–7 [discussing Proposition 64 legalizing recreational marijuana possession and use].) Deputies did not draw a sample

---

[6] The Legislature has classified marijuana as a hallucinogen. (Health & Saf. Code, § 11054, subd. (d)(13).) Consistent with this classification, we have recounted expert testimony that marijuana use "could produce anxiety attacks or paranoid episodes as well as producing perceptual distortions and visual hallucinations." (See, e.g., *People v. Hendrix* (1992) 8 Cal.App.4th 1458, 1461.)

of Garcia's blood for analysis because they did not expect that being under the influence would be an element of any potential criminal charge.

Based on the witnesses' testimony, and the inference of uncertainty created by the absence of any testing or analysis of the marijuana or her blood, Garcia requested that the court instruct the jury on the defense of involuntary intoxication. This instruction would have allowed jurors to "[c]onsider any evidence that [Garcia] was involuntarily intoxicated in deciding whether [she] had the required (intent/ [or] mental state) when [she] acted." (CALCRIM No. 3427.) To be involuntarily intoxicated, a person must either have "unknowingly ingested some intoxicating liquor, drug, or other substance" or must have been intoxicated without any fault of his or her own. (*Ibid.*) The court denied Garcia's request, reasoning that she voluntarily smoked the marijuana and there was "no evidence of involuntary intoxication."[7]

Garcia did, however, persuade the court to instruct the jury on the defense of accident. She was not guilty of ADW, jurors were instructed, "if she acted without the intent required for that crime, but acted instead accidentally." (CALCRIM No. 3404.) This instruction reminded jurors not to convict Garcia unless they were "convinced beyond a reasonable doubt that she acted with the required intent." (*Ibid.*) Accordingly, Garcia argued that she should escape liability because she accidentally ingested a drug other than marijuana.

---

7    The defense of voluntary intoxication, as Garcia recognized, is not available against assault because it is a general intent crime. (*People v. Hood* (1969) 1 Cal.3d 444, 455–458.)

11

2.    *Sua Sponte Duty to Instruct*

Garcia does not challenge the trial court's refusal to give the standard instruction she requested on involuntary intoxication (CALCRIM No. 3427). Instead, she claims the court erred by failing to recognize its sua sponte duty to instruct the jury on the defense of unconsciousness (CALCRIM No. 3425) due either to involuntary intoxication or having an "unsound mind." Garcia contends the instruction was supported by sufficient evidence and likely would have swayed at least one juror because she had "no reason to anticipate the effects she experienced" from smoking tainted marijuana or "could have been suffering from a mental health condition."[8] The People disagree that there was evidence either of involuntary intoxication or an unsound mind and argue in the alternative that any error in omitting this instruction was harmless in light of the jury's findings.

"[U]nconsciousness is a complete defense except where it is caused by voluntary intoxication." (*People v. Heffington* (1973) 32 Cal.App.3d 1, 8; accord § 26, subd. 4.) " 'To constitute a defense, unconsciousness need not rise to the level of coma or inability to walk or perform manual movements; it can exist "where the subject physically acts but is not, at the time, conscious of acting." ' " (*People v. James* (2015) 238 Cal.App.4th 794, 805 (*James*).) Because the law presumes "that a person who appears to act in an apparent state of consciousness is conscious," the defendant bears the burden to elicit evidence rebutting this presumption. (*Id.* at p. 804.) Legal unconsciousness may be caused by involuntary intoxication and "mental illness known generally in the law as 'unsound mind[.]' " (*Id.* at pp. 805–809.)

---

8    Garcia's mental health was discussed during the pretrial proceedings, but no evidence of a mental health condition was presented to the jury.

"A trial court must instruct on unconsciousness on its own motion if it appears the defendant is relying on the defense, or if there is substantial evidence supporting the defense and the defense is not inconsistent with the defendant's theory of the case." (*People v. Rogers* (2006) 39 Cal.4th 826, 887 (*Rogers*).) Garcia does not argue that the court's sua sponte duty was triggered by her reliance on the defense; instead, she contends the court should have recognized that substantial evidence supported it. "Substantial evidence is 'evidence sufficient for a reasonable jury to find in favor of the defendant.' " (*James*, *supra*, 238 Cal.App.4th at p. 804.)

Assuming without deciding that the evidence met this standard for both of Garcia's theories for the defense, we agree with the People that any error was harmless.[9] "The absence of an instruction on a defense is not prejudicial if ' "the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions." ' " (*People v. Gana* (2015) 236 Cal.App.4th 598, 610.) Put another way, failing "to instruct on unconsciousness" will be harmless error if "[b]y its verdicts and findings the jury clearly 'rejected defendant's [mental state] defense [citation] in another context.' " (*Id.* at pp. 610–611.)

Here, the jury found that Garcia willfully wielded a steak knife with a present ability to harm Jacob and while cognizant of facts that would lead a

---

9      The parties dispute whether prejudice is evaluated for error in accordance with *Chapman v. California* (1967) 386 U.S. 18 or under the more lenient standard announced in *People v. Watson* (1956) 46 Cal.2d 818. Considering that our Supreme Court has not determined which test applies to the failure to instruct on an affirmative defense (*People v. Gonzalez* (2018) 5 Cal.5th 186, 199) and that each party believes it should prevail under either test, we apply the more stringent *Chapman* standard and thus will not reverse if the error was harmless beyond a reasonable doubt. (*Chapman*, at p. 24.)

reasonable person to conclude that her act would "probably and directly result in the application of force." (CALCRIM No. 875.) These findings are irreconcilable with a claim that she lacked the mental wherewithal, under any theory, to commit an ADW based on unconsciousness. Indeed, in making these findings, the jury specifically rejected her argument that she lacked the required intent because she was accidentally intoxicated. We are satisfied that the jury would also have rejected her unsound mind theory had it been presented, as it had even less evidentiary support.[10]

## C. *Jury Instruction on Brandishing as a Lesser Included Offense*

Section 417, subdivision (a)(1) punishes as a misdemeanor the brandishing of a deadly weapon. Brandishing occurs when someone "who, except in self-defense, in the presence of any other person, draws or exhibits any deadly weapon whatsoever, other than a firearm, in a rude, angry, or threatening manner." The jury was instructed on simple assault (§ 240) as a lesser included offense (LIO) of ADW, but Garcia neither asked for an instruction on brandishing as a LIO nor did the court give that instruction on its own. During their closing arguments, however, each party supported its case in part by distinguishing between brandishing a knife and assaulting a person with one.

---

[10] In both *People v. Gallego* (1990) 52 Cal.3d 115, 183–184 and *People v. Velez* (1985) 175 Cal.App.3d 785, 795–797, defendants who ingested *illegal* drugs they did not know were tainted with other substances were not entitled to jury instructions on involuntary intoxication. The People urge us to extend these cases to cover the situation where a person smokes *legally* purchased marijuana that turns out to be tainted, a proposition Garcia, unsurprisingly, takes issue with. Because we have held that the omission of an instruction on unconsciousness in this case was harmless without deciding whether there was sufficient evidence of involuntary intoxication, we need not resolve this dispute.

14

Now on appeal, Garcia claims the trial court had a sua sponte duty to instruct on brandishing as a LIO because the misdemeanor crime was supported by substantial evidence. The court's failure to discharge this duty, Garcia argues, was prejudicial because the evidence fit the lesser crime as well or better than the charged one. The People dispute that brandishing is a LIO of ADW but also maintain that the omission of this instruction could not have been prejudicial.

"A trial court has a sua sponte duty to instruct the jury on any uncharged lesser offense that is necessarily included in a charged offense if there is substantial evidence from which the jury could reasonably conclude that the defendant committed the lesser included offense but not the charged offense." (*People v. Lopez* (2020) 9 Cal.5th 254, 269 (*Lopez*).) An uncharged crime is a LIO if it satisfies either of two tests, only one of which—the statutory elements test—is applicable here.[11] (*Lopez*, at pp. 269–270.) " ' "[I]f the statutory elements of the greater offense include all of the statutory elements of the lesser offense, the latter is necessarily included in the former." ' " (*Ibid.*) "We determine de novo whether one crime is a lesser included offense of another." (*Braslaw*, *supra*, 233 Cal.App.4th at p. 1247.)

Each party claims that the statutory elements test has already been decided in its favor. Garcia cites two Supreme Court cases which she maintains "endorsed the view" that brandishing is a LIO of ADW: *People v.*

---

[11] The alternative "accusatory pleading test" is met when " ' "the facts actually alleged in the accusatory pleading include all of the elements of the lesser offense." ' " (*Lopez*, *supra*, 9 Cal.5th at p. 270.) But where, as here, the accusatory pleading merely "tracks the statutory language rather than reciting factual details of the offense, 'only the statutory elements test is relevant' " to determining whether an uncharged crime is a LIO. (*People v. Braslaw* (2015) 233 Cal.App.4th 1239, 1247 (*Braslaw*).)

*Wilson* (1967) 66 Cal.2d 749 (*Wilson*) and *People v. Coffey* (1967) 67 Cal.2d 204 (*Coffey*). The People counter with two later decisions by different panels of the Court of Appeal reaching the opposite conclusion—*People v. Escarcega* (1974) 43 Cal.App.3d 391 (*Escarcega*) and *People v. Steele* (2000) 83 Cal.App.4th 212, review den. Dec. 13, 2000 (*Steele*).

In *Wilson*, the defendant complained that the trial court failed to sua sponte instruct on brandishing after he was convicted of, among other offenses, ADW involving a gun. (*Wilson*, *supra*, 66 Cal.2d at p. 752.) While resolving this allegation of error, the court noted that the defendant's testimony, if believed, supported an instruction that he had merely brandished a gun. (*Id.* at pp. 753, 756, 764.) Garcia refers us to this passage of *Wilson* as supporting the proposition that brandishing is a LIO of ADW:

> "This does not mean, however, that the judgment of conviction for assault with a deadly weapon upon Champion can be permitted to stand. That judgment of conviction must be reversed for failure to instruct on section 417. 'An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another.' (Pen. Code, § 240.) Defendant did not shoot or strike Champion; had the jury been instructed on section 417 the evidence would have justified the conclusion that defendant committed a violation of that section rather than the assault found. [Citation.] Under the rules set forth above, the error must be deemed prejudicial."
> (*Wilson*, at p. 764.)

A few months later in *Coffey*, another case involving a firearm, the Supreme Court was asked to resolve a multitude of issues concerning defendant's convictions for assault with intent to commit murder and four counts of ADW on police officers. (*Coffey*, *supra*, 67 Cal.2d at pp. 211–212.) The defendant's testimony, according to the court, would seem to have

16

established the elements of brandishing, which the jury was instructed was a LIO. (*Id.* at p. 222, fn. 21.) What was *not* at issue in *Coffey*, however, was the propriety of the trial court's decision to give this instruction. (*Ibid.*) Nonetheless, the court observed that "[t]he jury . . . was properly instructed that section 417 sets forth a lesser offense necessarily included in those charged." (*Ibid.*, citing *Wilson, supra*, 66 Cal.2d at 757–761.)

Seven years later in *Escarcega*, the First District Court of Appeal resolved a claim of trial court error in refusing the defendant's request to instruct the jury on brandishing as a LIO of ADW where the charged offense again involved a gun. (*Escarcega, supra*, 43 Cal.App.3d at p. 396.) The defendant made the same argument Garcia makes here—citing the above-quoted passage from *Wilson* and the footnote from *Coffey* as establishing that brandishing is a LIO of ADW. (*Escarcega*, at pp. 398–400.)

Our First Appellate District colleagues were not persuaded. They pointed out that *Wilson* did not "discuss or consider the rationale of the 'lesser and necessarily included offense.' Nor did the court hold that the elements of section 417 [brandishing] were necessarily included in the charge of assault with a deadly weapon." (*Escarcega, supra*, 43 Cal.App.3d at p. 399.) The appellate court continued: "[A]ccording to long-established principles, section 417 is not such a necessarily included offense. And it is significant that the [Supreme Court in *Wilson*] showed no purpose to overrule or modify those principles." (*Ibid.*) As for the footnote in *Coffey*, it was deemed dictum because it "was not responsive to any issue raised, and was unnecessary to the decision of that case." (*Escarcega*, at p. 400.) Accordingly, *Escarcega* held that brandishing was not a LIO of ADW and that there was no error in the trial court's refusal to instruct on it. (*Ibid.*)

17

The same claim and arguments rejected in *Escarcega* met the same fate several years later in *Steele, supra*, 83 Cal.App.4th 212. After endorsing *Escarcega*'s analysis of *Wilson* and *Coffey*, the *Steele* panel added that under both pre- and post-*Wilson* Court of Appeal precedent, "it has long been held that brandishing is a lesser related offense, rather than lesser included." (*Steele*, at p. 218.) "The reason of course, is that it is theoretically possible to assault someone with a firearm without exhibiting the firearm in a rude, angry or threatening manner, e.g., firing or pointing it from concealment, or behind the victim's back." (*Ibid.*) At most, the Second Appellate District stated, *Wilson* "implied—but did not directly hold—that brandishing was a lesser included offense to assault with a firearm." (*Id.* at p. 219.)

The *Steele* court candidly acknowledged that it was "caught in a dilemma" because a decision at variance with *Wilson* "might appear to put [it] at odds with the . . . rule requiring that [it] follow the holding of our Supreme Court." (*Steele, supra*, 83 Cal.App.4th at p. 221.) Ultimately, however, the court agreed with *Escarcega* that *Wilson* is an outlier that need not be followed because it was inconsistent with established law, not only on the principle of brandishing as not being a LIO of ADW under the elements test, but also because it contradicted the settled proposition that "the determination of whether an offense is lesser included is made from the language of the statute or the information, and not from the evidence adduced at trial." (*Ibid.*) Indeed, the panel noted, this second point was affirmed by the Supreme Court after *Wilson* was decided. (*Ibid.*) Thus, in the opinion of the *Steele* court, brandishing is not a LIO of ADW. (*Id.* at pp. 218–219.)

*Steele* is the last reported word on this subject, and we believe its reasoning and that of *Escarcega* are sound. Although we face the same

18

dilemma described in *Steele*, we take note of the Supreme Court's denial of a petition for review in that case, and such a denial, though hardly conclusive, is not "without significance." (*Di Genova v. State Bd. of Education* (1962) 57 Cal.2d 167, 178.) We also have the benefit of scholarly commentary suggesting that *Escarcega* and *Steele* control on this point. (See, e.g., 1 Witkin, Cal. Crim. Law (2024) Crimes Against the Person, § 216 [citing *Steele* for the rule that "Brandishing a firearm [citations] is not a lesser included offense of assault with a firearm"]; see Judicial Council of Cal., Crim. Jury Instns. (2025 supp.) Bench Notes to CALCRIM No. 875 [citing *Steele* and *Escarcega* for principle that "[a] misdemeanor brandishing of a weapon or firearm under [section] 417 is not a lesser and necessarily included offense of assault with a deadly weapon"].) Pending further guidance from the Supreme Court, we elect to follow this consensus in concluding that brandishing is *not* a LIO of ADW under the statutory elements test.

Garcia argues that her use of a knife is a distinction that undercuts the rationales adopted in *Escarcega* and *Steele*. But this is a distinction without a difference in this case because the elements of ADW under section 245(a)(1) and brandishing under section 417, subdivision (a) are the same regardless of the deadly weapon used. (CALCRIM Nos. 875 & 983; accord *Escarcega*, *supra*, 43 Cal.App.3d at p. 398 ["Obviously an assault with a deadly weapon may be perpetrated without drawing or exhibiting it in a rude, angry, or threatening manner, or using it in a fight or a quarrel. It might be committed by a hidden sniper, or by a stealthy prison stabbing, or in any other innumerable ways without at the same time being a violation of section 417"].) For these reasons, the trial court had no sua sponte duty to instruct on brandishing as a LIO in this case.

19

**D.**    *Ineffective Assistance of Counsel*

As noted, Garcia was sentenced to three years of supervised probation. Without a defense objection, the court imposed a probation condition that authorized searches of Garcia's person, home, and certain other property at any time without a search warrant, a so-called "Fourth Waiver."[12]  The defense did, however, successfully object to the scope of the proposed search condition when the court agreed that Garcia's *electronic devices* would not be subject to warrantless searches.

Garcia claims she did not receive effective assistance of counsel during the sentencing hearing because her trial attorney failed to object to the Fourth Waiver search condition in its entirety.  This waiver, Garcia argues, was erroneously imposed because it had nothing to do with either the crime she committed or her future criminality.  In response, the People contend there could be any number of reasons why Garcia's trial counsel did not object to this condition such that it is impossible on appeal to determine whether her attorney's performance was deficient.  In any event, they assert, an objection to this condition would have been futile.

To establish ineffective assistance of counsel, a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) a reasonable probability that, but for counsel's failings, he or she would have obtained a more favorable result. (*People v. Hoyt* (2020) 8 Cal.5th 892, 958.)  We must presume that Garcia's trial "counsel's actions [fell] within the broad range

_____

12    "A 'Fourth Waiver' is a shorthand term" used when "a person whose 'reasonable expectation of privacy' under the Fourth Amendment has been . . . 'significantly diminished' by a condition of probation."  (*People v. Cervantes* (2017) 11 Cal.App.5th 860, 863, fn. 2.)

of reasonableness." (*People* v. *Mickel* (2016) 2 Cal.5th 181, 198.)  This presumption is unrebutted where the record " ' "sheds no light on why counsel . . . failed to act in the manner challenged." ' " (*People* v. *Lopez* (2008) 42 Cal.4th 960, 966; accord *People v. Mai* (2013) 57 Cal.4th 986, 1009 [on direct appeal, deficient performance can only be shown if "(1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation"].)

We do not know why Garcia's trial counsel did not object to the Fourth Waiver  condition.  One could infer from the record that this was a strategic decision given that he *did* object to that portion of the condition that authorized the warrantless search of Garcia's electronic devices.  We also observe that counsel told the court Garcia understood and agreed to abide by all other probation conditions, which suggests that the trial attorney may have been instructed not to lodge the objection Garcia's appellate counsel now believes should have been made.  In short, there is no basis on this record to question trial counsel's judgment in not objecting to the Fourth Waiver.  We therefore have no choice but to affirm the judgment.  Garcia's remedy, if any, is by way of habeas corpus. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266–267.)

## DISPOSITION

The judgment is affirmed.


DATO, J.

WE CONCUR:

IRION, Acting P. J.

CASTILLO, J.

21